UNITED STATES of America,
Plaintiff–Appellee,

v.

Charles Lee YOUNG, Defendant–
Appellant.

No. 92–50731.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 4, 1994.

Decided March 1, 1994.

Michael J. Treman, Santa Barbara, California, for the defendant-appellant.

Russell G. Petti, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

Before: GOODWIN, HALL, Circuit Judges, and TANNER,* District Judge.

GOODWIN, Circuit Judge:

Charles Lee Young, and his codefendants William Forry and Daniel Dean Bryan, appeal their convictions and sentences for methamphetamine trafficking. 21 U.S.C. § 841(a)(1). Young argues primarily that the district court erred in denying his motion for a new trial based on the government's use of false evidence against him.[1] We agree and reverse.

## I.

On November 21, 1991, at approximately five a.m., Riverside County deputy sheriffs executed a warrant to search a certain residence in Quail Valley, California. The search uncovered a fully functional methamphetamine laboratory in a back room. Codefendants Young, Bryan and Forry were arrested on the scene and indicted for (1) possession of methamphetamine with intent to distribute and (2) methamphetamine manufacture. 21 U.S.C. § 841(a)(1).

* Honorable Jack E. Tanner, United States District Judge for the Western District of Washington, sitting by designation.

1. We address Young's other arguments, as well as Bryan and Forry's claims, separately in an unpublished memorandum.

At their joint trial, the government described the methamphetamine lab and presented physical evidence relating to methamphetamine manufacture. Two police officers testified that Bryan and Forry were in the living room when police entered, but immediately ran into the back room containing the laboratory. Because all three defendants were ultimately arrested in the back room, this testimony suggested that Young was in the laboratory room alone when the police arrived.[2]

Young testified in his own defense, claiming that he was on the couch asleep when police arrived and did not know of the methamphetamine lab in the back room. He said he was a visitor to the house and had been to the house "three or four times" to paint the interior and to pick up trash. Bryan had paid him for this work. He had never seen any evidence of the laboratory before the night of the raid. The door to the lab was always closed and padlocked.

Young also testified that several days before his arrest, he had helped Bryan recover his wrecked truck from Lake Elsinore where Bryan had "rolled" it. In helping Bryan tow the wrecked truck, Young said he took Bryan's papers out of his cab and placed them in his truck. Thus, not all of the papers found in Young's truck belonged to him.

Finally, Young explained his presence at the house at the time of the police raid. He said that, on the day of his arrest, his landlord had offered to pay him $100 if he helped sell one of the landlord's trucks. Since Bryan had just wrecked his truck, Young called Bryan and asked if he wanted to buy the landlord's truck. Bryan expressed interest, so Young worked on the truck for most of the day, and then picked Bryan up at the Quail Valley residence and drove him to see the truck.[3] They returned to Quail Valley

late that night. Since Young was too tired to drive the 30 to 45 minutes home, Bryan invited him to stay the night. Young fell asleep on the couch and woke up when the police arrived.

On cross-examination, the government introduced certain incriminating papers found in Young's truck. Young identified one notebook as his, but stated that other notebooks and "Chem Lab" business cards did not belong to him. On redirect, the defense showed that the notebook Young did identify confirmed his story about recovering Bryan's wrecked truck.[4]

In rebuttal, the government called Detective Richard Sheldon, who testified that the notebooks Young could not identify were found taped under the dashboard of Young's truck. Sheldon admitted that he had not personally searched Young's truck, but stated that he had been present when Officer Michele Amicone searched the truck and that she had told him that the notebooks were taped under the dashboard. Another government witness interpreted certain writings in the notebooks as relating to methamphetamine manufacture. However, a government handwriting expert could not identify the writing.

In his closing, the prosecutor referred specifically to Sheldon's testimony, stating that "that is not how innocent people keep their papers." The prosecutor also contended that Young's testimony was not credible because the incriminating notebooks were found together with a notebook Young had admitted was his. The jury found all three defendants guilty.

After the verdict, Officer Amicone returned from vacation and Young's lawyer learned that she had not found the notebooks and Chem Lab cards taped under the dashboard of Young's truck, but in a paper bag in

---

2. However, as Young argues to this court, police could have mistaken him and Forry in the confusion, as both he and Forry were wearing red shirts. The record confirms that the police raid occurred under hurried, confusing circumstances and that police officers did confuse Young and Forry (and Forry and Bryan) later in the raid.

3. Some witnesses, including Young's brother, mother, and friend, corroborated parts of his story.

4. The back cover of this notebook also contained incriminating notations about "corks" similar to those in the other notebook. Young testified that these were not his notes. To the inexpert eye, the handwriting does appear different.

the cab of the truck. Young then filed a motion for a new trial, attaching a declaration from Officer Amicone. At the hearing on this motion, Officer Amicone testified that she had told the prosecuting United States Attorney where she had found the notebooks. Although Amicone could not remember the exact date of this conversation, she said it took place during the trial, shortly before she left for vacation. The prosecutor stated that she did not recall Amicone telling her this information and argued that the officer must have been mistaken.

The district court denied Young's motion for a new trial, explaining that:

> I believe there were other facts elicited during cross-examination and the redirect of that same witness as well and there were further facts that clarified the issue through other witnesses before the jury. I'm not so persuaded that the theories you argue in your motion for new trial were of such a weight that I should grant your motion, and I would deny your motion for new trial. Motion is denied.

The court did not make any specific findings.

## II.

Young contends that the district court erred in denying his request for a new trial based on Officer Sheldon's false testimony. We agree.

## A.

■ We review a district court's decision not to grant a motion for a new trial for abuse of discretion. *United States v. George*, 960 F.2d 97, 101 (9th Cir.1992); *United States v. Endicott*, 869 F.2d 452, 454 (9th Cir.1989). However, "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have effected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976).[5]

■ The appearance of misconduct in this case is serious. Young presented competent evidence that the prosecutor knew Sheldon's testimony was false. Officer Amicone testified under oath that she told the prosecutor where she found the notebooks and Chem Lab cards. She said this conversation took place during the trial, shortly before she left for vacation, in which case it occurred shortly before Sheldon testified.[6] Prosecutors not only presented Officer Sheldon's false testimony but referred specifically to it during closing arguments.

The government argues that no misconduct occurred, contending that the prosecutor did not know Officer Sheldon's testimony was false and that Officer Sheldon did not deliberately commit perjury. It emphasizes that it came forward with the evidence promptly after the trial and that the prosecutor stated that she did not recall the conversation with Officer Amicone. It argues that the district court must have resolved these credibility issues in favor of the prosecutor and that this credibility determination is not clearly erroneous.[7]

However, a government's assurances that false evidence was presented in good faith are little comfort to a criminal defendant wrongly convicted on the basis of such evidence. A conviction based in part on false

---

5. *See also Endicott*, 869 F.2d at 455 (citing *Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 765, 31 L.Ed.2d 104 (1972) and *United States v. Bagley*, 473 U.S. 667, 678–80, 105 S.Ct. 3375, 3381–82, 87 L.Ed.2d 481 (1985)) ("[D]eliberate deception of the court by the presentation of false evidence is incompatible with rudimentary demands of justice" and a resulting conviction must be set aside "if there is any reasonable likelihood that the false testimony could have effected the jury verdict.").

6. Officer Amicone herself testified two days before Detective Sheldon did so, and had left for vacation by the time Sheldon testified.

7. The government also contends that the testimony was not false as Officer Sheldon stated that he "believed" the papers were taped under the dashboard. This argument does not merit consideration. Officer Sheldon's use of the word "believed" is a mere figure of speech and in no way negates the effect of his testimony. Moreover, he specifically testified that Officer Amicone told him the items were taped under the dashboard, which appears false.

evidence, even false evidence presented in good faith, hardly comports with fundamental fairness. Thus, even if the government unwittingly presents false evidence, a defendant is entitled to a new trial "if there is a reasonable probability that [without the evidence] the result of the proceeding would have been different." *Endicott*, 869 F.2d at 455 (citing *United States v. Bagley*, 473 U.S. 667, 678–80, 105 S.Ct. 3375, 3381–82, 87 L.Ed.2d 481 (1985)).

Reviewing the record in its entirety, we find a reasonable probability that the result would have been different had the government not presented Officer Sheldon's false testimony. Young is therefore entitled to a new trial, whether or not the prosecutor knew Sheldon's testimony was false and whether or not Officer Sheldon committed perjury or was simply mistaken.

### B.

Contrary to the government's claims, the evidence against Young was far from "overwhelming." Although Young was arrested in a house containing a methamphetamine laboratory, little direct evidence connected him to the methamphetamine laboratory or to the house. Young did not own, rent or live in the house. His fingerprints were not found anywhere in the laboratory or the house. Handwriting experts were unable to identify the incriminating writings as Young's. The informants whose statements led to the search warrant did not mention Young. Unlike Forry and Bryan, Young did not attempt to destroy the laboratory when police entered.

The government's strongest evidence against Young was (1) Young's presence at the scene; (2) the officers' testimony that Young was in the laboratory when they entered the house; and (3) the notebooks and business cards in Young's truck. Young offered a plausible, partially corroborated explanation of all of this evidence. He explained why he was in the house at the time of the raid. He said he ran into the laboratory room because he was startled by the

police entry. He denied knowledge or ownership of the incriminating notebooks and business cards and offered the plausible explanation that he had placed some of Bryan's papers in his truck when he helped Bryan tow his truck. He said he was not in the laboratory at the time the police arrived, but asleep on the couch, and argued that police must have confused him and Forry during the raid.

Nothing contradicted Young's testimony other than the officers' testimony that Young must have been in the laboratory when they arrived. A reasonable jury could have found that these officers were mistaken. The police raid occurred late at night under stressful and confusing circumstances.[8] Both Young and Forry were wearing red shirts. Officer Andrews, one of the two officers who identified Forry as the defendant on the couch, admitted that he confused Young and Forry later in the raid because of their similar clothing. Two other officers testified inconsistently about whether Bryan or Forry overturned a certain beaker, attesting to the general confusion of the scene.

Whether a jury would in fact accept Young's story depended on how credible he appeared as a witness. Sheldon's false testimony seriously undermined Young's credibility. It was inconsistent with Young's story about placing Bryan's papers in his truck temporarily and with his claim of not knowing Bryan and Forry were methamphetamine traffickers. A jury who found that Young was lying about one fact is much more likely to believe that Young was lying about other facts, including being on the couch and being involved in the methamphetamine business.

Moreover, taping anybody's papers under a dashboard is obviously an attempt to hide them. The notebooks themselves contained incriminating notations about methamphetamine manufacturing. Thus, Officer Sheldon's false testimony not only rendered Young's testimony implausible, it was also strongly probative of guilty knowledge. As

---

8. Because police informants had warned that Bryan and Forry were heavily armed and that the house was guarded by surveillance cameras, police set off a diversionary "flash bang" near the house as they entered and ran into the house yelling and carrying guns.

the prosecutor argued in closing, "that is not how innocent people keep their papers."

That Sheldon admitted on cross-examination that he did not personally search Young's truck did not render his testimony harmless. An officer's testimony that another officer told him where certain evidence was found is highly credible, almost as credible as testimony that the officer himself found the items. Young was unable to offer any evidence refuting Sheldon's story.

See also 638 F.2d 84.

 Given the weakness of the case against Young and the prejudicial nature of the false evidence, a new trial is "required in the interest of justice." Fed.R.Crim.P. 33.[9]

Young's conviction is REVERSED and the case is REMANDED for a new trial.

---

9. Because we find that Young is entitled to a new trial, we need not reach his claim that the district court abused its discretion in refusing to hear his motion to suppress the evidence found in his truck. Contrary to the government's arguments, Young may renew this claim on remand. Although the government contends that the district court exercised its Fed.R.Crim.P. 12(f) discretion to refuse to hear an untimely motion, *see United States v. Kessee*, 992 F.2d 1001 (9th Cir.1993), the record indicates that the district court refused to hear Young's motion only after the government indicated that it did not intend to use the evidence in its case in chief. *See United States v. Havens*, 446 U.S. 620, 627, 100 S.Ct. 1912, 1916, 64 L.Ed.2d 559 (1980) (illegally seized evidence admissible to impeach); *United States v. Issacs*, 708 F.2d 1365, 1372 (9th Cir.), *cert. denied*, 464 U.S. 852, 104 S.Ct. 165, 78 L.Ed.2d 150 (1983). The district court therefore never reached the merits of Young's suppression motion or his claim that he was not adequately notified that the police searched his truck. *See* Fed.R.Crim.P. 12(f) (a district court may hear a motion which is untimely "for cause shown"); *Kessee*, 992 F.2d at 1003. Thus, Young may renew these arguments on remand.