Joe Henry McMILLAN, Petitioner–Appellant,

v.

Al GOMEZ, Warden of Deuel Vocational Institute, Respondent–Appellee.

No. 93–15730.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 12, 1994.

Decided March 21, 1994.

Robert Rainwater, Asst. Federal Defender, Fresno, CA, for petitioner-appellant.

Arnold Overoye, Sr. Asst. Atty. Gen., Sacramento, CA, for respondent-appellee.

Before: CHOY, SCHROEDER and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

Joe Henry McMillan, a California state prisoner, brought a petition for habeas corpus in the federal district court, which denied it. He appeals. We affirm the denial of the writ.

## FACTS AND PRIOR PROCEEDINGS

McMillan was convicted in 1981 of committing a murder in the course of an attempted robbery in violation of California Penal Code § 187 and was sentenced to 25 years to life. The evidence against him was as follows:

On May 15, 1979 at about 8:30 in the evening, Thomas Kerber, a clerk at Dorsey's Liquor Store in Fresno, California, was shot to death at the cash register of the store. He had been killed by two bullets, one which passed through his heart and right lung and lodged in his back, causing him to fall. The second had entered his left armpit and was consistent with having been fired from above as he lay on the floor. His own gun was found under his body. On the counter was a single 16–ounce can of Budweiser, bagged in a white bag. The price of the beer, 45 cents, had been rung up on the register. The can was still cold to the touch when the police arrived after the shooting, and a small amount of condensation remained on it. The can was examined for fingerprints. McMillan's fingerprints and palm print were found on the can.

Monday through Friday the peak hours for Dorsey's sales of beer were 3:30 P.M. to 8:30 P.M. By 7:00 the six-packs in the whole front row of the rack would be gone. Dorsey Mason, the owner, regularly replaced the front row at this hour with six-packs from the back of the rack. A single can touched before then would either have been sold or rotated to the back at 7:00 P.M.

Another customer at Dorsey's at 8:30 p.m. on May 15, 1979 was Tony Gutierrez, who purchased a six-pack from Kerber, paid for the beer and left. He noticed only one other person in the store, a black man 5 feet, 9 inches to 5 feet, 11 inches tall, of slim build, in his twenties or thirties. As Gutierrez got into his truck and pulled away, his brother-in-law, Nick Ybarra, observed a man at the cash register whom he identified in the same general terms used by Gutierrez. Gutierrez noticed two women waiting at a traffic light across the street from Dorsey's. The two women were Bea Landrith and Emily Riggins, who were waiting at a traffic light at this time. As the light changed and they crossed the street they heard gunfire and saw a man standing in the front of the checkout counter with a gun in his right hand. He was a black man 25–30 years old, 5 feet, 10 inches tall, of slim build. McMillan was not identified by any of the four eyewitnesses. Their description of the man they saw in the store fitted his appearance, age, and build.

A warrant was issued for McMillan's arrest, and he was located in Portland, Oregon. Detective John Reynolds interviewed him at the Portland police department on November 16, 1980. Reynolds advised him of his *Miranda* rights. McMillan agreed to talk. The ensuing two-hour conversation was tape-recorded. Reynolds informed McMillan that his fingerprints had been found on a beer can in the liquor store where the murder had been committed. McMillan stated: "I do not know how they got there. I was not even there." He denied that he had ever visited

Fresno in 1979. He also denied that he knew the location of Dorsey's.

At trial McMillan took the stand and admitted that he had been in Fresno on May 15, 1979, visiting his parents. He said that he had driven his pregnant sister to cash a welfare check in the middle of the day and had then bought a six-pack of Budweiser at Graves Liquor Store. He and his sister then drove around Fresno, drinking beer and smoking marijuana. While the sun was still up they stopped at Dorsey's to get more beer. McMillan went in and went to the refrigerator section and felt several Budweisers, looking for the coldest. He pulled one out, paid for it and left. He and his sister then drove around some more and returned home while it was still daylight. He fell asleep on the floor and was not out after dark. He explained that when he talked to Detective Reynolds he had not remembered being in Fresno in 1979, but did remember it after he returned under arrest.

McMillan's sister, Anita, confirmed his story that they had cashed her welfare check on May 15 and bought a six-pack at Graves Liquor Store and had driven around Fresno, drinking the beer, smoking marijuana and "getting loaded." She also confirmed that McMillan had entered Dorsey's, saying that he was going to buy two more beers, but returning with only one, saying he had only enough money for one. In one respect her testimony contradicted McMillan's. She stated that they reached Dorsey's "about sundown." It was stipulated that sunset occurred at 7:59 p.m.

At trial, McMillan, through cross-examination of Detective Reynolds, sought to establish that McMillan had been highly cooperative in answering Reynolds' questions in Portland, Oregon. On redirect, the prosecutor then sought to question Reynolds regarding McMillan's refusal to cooperate after he had returned to Fresno, but before his arraignment. McMillan's counsel objected on the ground of relevance and was overruled. On direct, he was asked when he first remembered being in Fresno in 1979. McMillan said it was on being returned to Fresno by Reynolds and seeing Fresno on the way in from the airport. He was asked why he

didn't tell Reynolds then that he remembered. He answered, "Because I wasn't quite sure that it was in '79." On cross-examination the prosecution questioned him vigorously as to why he said nothing to Reynolds on the way in from the airport.

In the conference on the instruction to be given the jury, counsel for McMillan proposed there be instruction on both second-degree murder and voluntary manslaughter, even though McMillan's defense was an alibi. McMillan himself told the court that he did not want any instruction on the lesser charges. The court then spoke directly to McMillan, saying that the jury might proceed by first deciding not who did it but what crime had occurred. The court observed:

The first thing that they might determine in this case is that instead of a man going to a store and attempting a robbery, a man went in the store and took something up to the counter to buy it, got into an argument with the proprietor over something and there was a mutual shooting, instead of an attempted robbery.

The court did instruct on felony murder, second-degree murder and manslaughter. The court also gave CALJIC instruction No. 2.52, a standard California instruction that flight "if proved" was evidence of guilt. It also gave a standard California instruction on circumstantial evidence. CALJIC Instruction No. 2.01. The court refused the defense request to give CALJIC 2.02 which explicitly relates to the circumstantial evidence necessary to show specific intent. After McMillan's trial and conviction he appealed to the Court of Appeals, 5th Appellate District, which affirmed. The California Supreme Court denied his petition for review. Three petitions for habeas corpus have been denied in the California courts. On August 14, 1992, the present petition was filed in the District Court for the Eastern District of California. McMillan appeals its denial, alleging several errors, which we review in turn.

## ANALYSIS

■ *Sufficiency of the evidence.* In undertaking a review of the sufficiency of the evidence in a habeas corpus proceeding we

must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). In our review, "*all of the evidence* is to be considered in the light most favorable to the prosecution." *Id.* (emphasis in original). The prosecution has no "affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." *Id.* at 326, 99 S.Ct. at 2792. Rather, if the record of historical facts supports conflicting inferences, we must presume "that the trier of fact resolved any such conflicts in favor of the prosecution," *id.*, and we must "defer to that resolution." *Id.*

■ Relying on *Mikes v. Borg,* 947 F.2d 353 (9th Cir.1991), McMillan contends that the fingerprint evidence was insufficient to prove his crime. In *Mikes* the court granted a writ of habeas corpus to a California prisoner convicted of murder; the court found that the prosecution had failed to prove that the defendant's fingerprints had been placed on the murder weapon at the time of the murder "and not at some earlier point." *Id.* at 359. Here, to the contrary, the prosecution presented evidence from which a jury could rationally conclude that the fingerprints of the defendant could have only been put on the beer can at a time very close to the murder; that the can was still cold with some condensation was persuasive that it only very recently had been removed from refrigeration. Dorsey Mason's testimony was persuasive that McMillan could not have touched a can before 7:00 P.M. that was still in the store in the front rack at 8:30 P.M.

The trial court, in discussing the instructions, indicated the possibility that the jury could find that the killing was the result of an argument, not an attempted robbery. As the case was submitted to the jury with this possibility present and the jury returned the verdict of first-degree murder, this theory was rejected by the jury. It did so rationally on the basis of evidence. A very short space of time elapsed between the time the man who shot the clerk was observed at the cash register and the shots—too short a time a jury could conclude for an argument to lead

to a gun battle. The fact that the beer had been already packaged to go showed that Tom Kerber was complying with his customer's wishes. The inference the jury could rationally draw was that the man in the back of the store had waited until the last customer left, had taken one beer to the register so that Kerber would open the register, and then had demanded the register's contents, at which point the man drew his gun, Kerber made an ineffectual motion for his gun, and McMillan shot him dead. Killing in the course of attempting to perpetrate a robbery was established. That the killer was McMillan was proved by the fingerprints on the Budweiser.

■ *The jury instructions.* McMillan argues that the instruction on flight should not have been given when the identification of the person fleeing was not established. However, the prosecution had made a strong showing that it must have been he who left the scene after leaving his fingerprints on the cold beer can. The jury was expressly instructed that defendant's flight was evidence of guilt only if defendant's flight were proved.

■ The objection to the instruction on circumstantial evidence is a quibble. The instruction given was ample and exact. There was no need to precisely tie it to proof of specific intent. As to neither instruction was a genuine federal constitutional issue raised.

■ *Doyle error and ineffective assistance.* Under *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1979) a criminal defendant may not be impeached if he remains silent following *Miranda* warnings. In an extension of *Doyle* McMillan argues that Reynolds should not have been questioned about McMillan's silence when he was with Reynolds in Fresno.

■ On cross-examination of Reynolds, McMillan's counsel had sought to give the impression that McMillan was cooperative with the police. It was proper for the prosecution to refute this impression by asking about his later noncooperation. As for the later questioning about the reasons for his

silence, the subject was opened by counsel for McMillan on her direct examination of McMillan.

Counsel's claim on this appeal that McMillan received ineffective assistance from his trial counsel borders on the preposterous. The record shows a diligent and active defense attorney doing her best to defend a difficult case. At no point did she come close to failing to act as a good lawyer should.

■ *Felony murder.* Counsel makes an attempt to suggest that the California felony murder rule is unconstitutional because it creates a mandatory presumption of malice. Courts have held that California's felony murder rule is not an evidentiary shortcut to finding malice, but a rule of substantive law establishing a first degree murder penalty for murders which occurred in the course of committing another felony. *See, e.g., Suniga v. Bunnell,* 998 F.2d 664 (9th Cir.1993); *People v. Dillon,* 668 P.2d 697 (1983). The defendant's intent, which the prosecution must still prove, relates to the other felony rather than the murder. The felony murder rule is too deeply rooted in Anglo–American jurisprudence to be questioned now.

### CONCLUSION

McMillan's conviction was the result of alert police work and effective prosecution. He had a fair trial at which he was defended by competent counsel. He was proved guilty beyond a reasonable doubt.

AFFIRMED.