REVERSED as to Appellant Frenette; AFFIRMED as to Appellants Rein, Croces, and Driscoll.

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**William BUSHYHEAD, Sr.,**
**Defendant–Appellant.**

**No. 00–10396.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 10, 2001.

Filed Oct. 30, 2001.

Michael J. Kennedy, Office of the Federal Public Defender, Reno, Nevada, for the defendant-appellant.

Ronald Rachow, Office of the United States Attorney, Reno, Nevada, for the plaintiff-appellee.

* Honorable Henry A. Politz, Senior Circuit Judge for the Fifth Circuit, sitting by designa-

Before: POLITZ,* W. FLETCHER, and FISHER, Circuit Judges.

## OPINION

WILLIAM A. FLETCHER, Circuit Judge:

A jury convicted William Bushyhead of first-degree murder in the Indian Country of the United States in violation of 18 U.S.C. §§ 1111, 1151, and 1153. The district court sentenced him to the statutorily required term of life imprisonment. Bushyhead appeals on three grounds: First, he argues that a new trial is required because the petit jury pool did not include jurors drawn from Indian tribal voting lists in violation of the Sixth Amendment and the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1863(b)(3), 1869(e). Second, he argues that the trial court violated the Fifth Amendment when it permitted an FBI agent to testify that after arrest but before receiving *Miranda* warnings Bushyhead told him, "I have nothing to say, I'm going to get the death penalty anyway." Third, he argues that the evidence was insufficient to support a verdict of first-degree murder.

We find error as to Bushyhead's second ground. We hold that the agent should not have been allowed to testify as to what Bushyhead said when he invoked his right to silence under *Miranda*. However, we hold that the error was harmless. We find no error as to the other two grounds.

tion.

## I

Bushyhead is a Native American who, at the time of the events in question, lived in Wadsworth, a town with fewer than 900 people, located on the Pyramid Lake Indian Reservation in northern Nevada. From June 20 to June 22, 1999, Bushyhead stayed at the home of his friend Stanley John. According to John, Bushyhead spent "pretty much" the whole two days drinking. John testified that on June 22, he and his girlfriend went to bed at about ten o'clock after talking with Bushyhead in John's living room. John testified that he kept a sheathed hunting knife with a ten- to eleven-inch blade in his closet.

Carey Zeigler and her two children lived at 240 Ninth Street, about a half mile from the John residence. The United States holds this property in trust for the benefit of the Pyramid Lake Tribe, and the property was leased to the Bushyhead family. Zeigler testified that she and Bushyhead had had a five-year relationship that ended in 1996 and that Bushyhead was the father of her children. In 1998, Zeigler and Bushyhead signed a lease allowing Zeigler to live in the house.

On the night of June 22, Tim Gardner was staying with Zeigler at 240 Ninth Street. According to Zeigler, she had met Gardner about a week earlier. Zeigler testified that on that night she had gone to bed around ten o'clock. She awoke to find Bushyhead standing in a one-foot gap between the bed and the wall, stabbing Gardner who lay in the bed next to her. The pathologist who conducted the post-mortem examination testified that Gardner was stabbed or slashed a total of thirty-nine times. The wounds included three stab wounds to the heart, a stab wound to the aorta, a large wound across the neck, and seven or eight stabs into the body cavities. The pathologist testified that

Gardner probably died within two or three minutes of the attack.

Zeigler testified that during the stabbing, she fought Bushyhead and then, failing to stop Bushyhead's attack, ran out of the bedroom. As Zeigler tried to unlock the front door, Bushyhead grabbed her, said, "I got something to show you," walked her to the bedroom where Gardner's body lay face down, and asked, "Do you want this to be you?" Zeigler testified that Bushyhead appeared "really calm" and "pretty sober" during this time. Zeigler then fled the house and sought the police.

John testified that he was awakened by the sound of Bushyhead calling his name. According to John, he walked into the hallway to see Bushyhead and Bushyhead's three-year-old son, both covered with blood. John testified that Bushyhead told him he thought he "might have killed somebody." When the police arrived at the John residence, Bushyhead was on the porch drinking beer. John testified that as the police were taking Bushyhead away, Bushyhead yelled to John that there was a knife in the mop bucket. John's hunting knife was later found in a mop bucket in the John residence. The sheath to the knife was found on a counter top in John's home.

After his arrest, Bushyhead was taken to the hospital where he was restrained by handcuffs and leg restraints. FBI Special Agent Olsen testified that he approached Bushyhead in the hospital. According to agent Olsen, Bushyhead's shoes appeared unstained but his socks were saturated with blood. As he approached, agent Olsen held a printed *Miranda* warning statement in his hand. Agent Olsen was permitted to testify at trial that Bushyhead said, "I have nothing to say, I'm going to get the death penalty anyway." The district court instructed the jury that the

statement was to be used only "for the limited purpose of tending to show the defendant was conscious of having committed a homicide." The district court permitted reference to this statement both in the prosecution's opening and closing arguments.

A clinical psychologist testified for Bushyhead that he had a history of alcohol abuse, and that while he had not suffered long-term brain impairment, he did suffer transient delirium during periods of intoxication. The psychologist also testified that Bushyhead had been on a several-day drinking binge prior to the crime and that his memory had become spotty after the first day or two of the binge. In particular, he testified that Bushyhead could not remember the events leading up to, and including, Gardner's murder.

The jury found Bushyhead guilty of first-degree murder. Bushyhead timely appealed. We address his arguments in turn.

## II

Bushyhead first points out that the Jury Selection Plan in the District of Nevada draws jurors only from county voting lists, and does not also draw jurors from "tribal voting lists." He argues that this deprives him of his Sixth Amendment right to a jury reflecting a fair cross-section of the community, and violates the requirement of the Jury Selection and Service Act of 1968 ("JSSA"), 28 U.S.C. § 1861 et seq., that all political subdivisions be included in a jury pool. Bushyhead does not define "tribal voting lists" in his briefs to us, but he appears to refer to lists of registered voters in tribal elections who are not also registered to vote in state and federal elections.[1] Bushyhead thus seeks to expand the current jury pool in the Nevada district beyond voters only registered to vote in state and federal elections in order to increase the representation of Native Americans in the jury pool.

■ We review independently a challenge to the composition of a petit jury venire. *Thomas v. Borg,* 159 F.3d 1147, 1149 (9th Cir.1998). With respect to Bushyhead's right to a fair cross-section of the community under the Sixth Amendment, the test is set forth in *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). Under *Duren,*

> to establish a prima facie violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due

---

1. Bushyhead's arguments to include voters who appear only on "tribal voting lists" might appear to fail at the outset because the voter lists specifically mentioned by the statutes are limited to state and federal elections. *See* 28 U.S.C. § 1869(c) ("'[V]oter registration lists' shall mean the official records ... of persons registered to vote in either the most recent State or the most recent Federal general election, or, ... other official lists of persons qualified to vote in such election."); 28 U.S.C. § 1869(d) ("'[L]ists of actual voters' shall mean the official lists of persons actually voting in either the most recent State or the most recent Federal general election...."). Bushyhead's argument is not, however, precluded by these provisions because 28 U.S.C. § 1863(b)(2) states that a district's plan "shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured" by the jury selection statutes. Whether tribal voting lists are appropriate "other sources" would likely depend on how the lists were kept, who is eligible to vote, and other factors. In light of our holding on other grounds, however, we need not reach that question.

to systematic exclusion of the group in the jury-selection process.

*Id.* at 364, 99 S.Ct. 664. Bushyhead conceded in the district court, though not in his brief to us, that his challenge does not satisfy the second and third prongs of the *Duren* test. We agree with Bushyhead's concession. He has presented no evidence from which we could conclude that these prongs have been satisfied.

 The substantive standards for a fair cross-section under the JSSA are the same as those articulated in *Duren.* "The test for a constitutionally selected jury is the same, whether challenged under the fifth and sixth amendments of the Constitution or under the [JSSA]." *United States v. Herbert,* 698 F.2d 981, 984 (9th Cir. 1983). But Bushyhead argues that additional requirements, specific to the JSSA, were not satisfied. The JSSA requires that no political subdivision be excluded from a jury plan. *See* 28 U.S.C. § 1863(b)(3) (A district's voting procedures "shall ensure that names of persons residing in each of the counties, parishes, or similar political subdivisions within the judicial district or division are placed in a master jury wheel."); 28 U.S.C. § 1869(e) (stating where a district has no statutory division, "each county, parish, or similar political subdivision shall be included in [a] division"). The JSSA relies on these kinds of political subdivisions as a means of achieving a fair cross-section of the community. It does not, however, grant a right to any particular kind of political subdivision to be used in order to achieve that fair cross-section.

 The JSSA requires that jury plans include all *"persons* residing in each of the counties, parishes, *or* similar political subdivisions." 28 U.S.C. § 1863(b)(3) (emphasis added). The JSSA thus leaves it to each judicial district to determine which kind of political subdivision to use-county, parish, *or* "similar political subdivision[ ]"-so long as all persons are included in the subdivisions chosen and thus in the overall jury pool. Nevada's jury plan follows this principle. People living on tribal lands in Nevada are not excluded from the jury pool. Everyone living in Nevada, whether residing on tribal land or not, falls within the boundaries of a Nevada county. Citizens living on Indian land can become part of the jury pool by registering in a state or federal election, just like citizens in other parts of Nevada. Further, Bushyhead has supplied no statistics from which we can determine what the percentage of Native American voters in the jury pool would have been if tribal voting lists had been used in addition to county voting lists. We therefore conclude that Bushyhead has not shown that the current Nevada jury plan, using county voting lists, excludes Native Americans from the jury pool in violation of the JSSA.[2]

---

2. Bushyhead also contends that voters in the Elko division of the northern division of the District of Nevada are not included in the jury pool for the Reno division in which he was tried; that the percentage of Native Americans in the Elko division is significantly higher than in the Reno division; and that only one criminal trial has been conducted in the Elko division in the last ten years. Based on these contentions, Bushyhead argues that his Sixth Amendment rights have been violated. If properly presented, Bushyhead might have a cognizable claim under the rationale we expressed in *United States v. Etsitty,* 130 F.3d 420, 425–26 (9th Cir.1997), *as amended by* 140 F.3d 1274 (9th Cir.1998). But Bushyhead failed to make and provide evidentiary support for this argument to the district court. Not only does he seek to make this argument for the first time on appeal, he also seeks to support it with an affidavit prepared while this case was on appeal. Because this argument was not timely raised and supported, we do not consider it. *See Hormel v. Helvering,* 312 U.S. 552, 556, 61 S.Ct. 719, 85 L.Ed. 1037 (1941).

## III

Bushyhead next argues that the district court committed reversible error when it permitted Agent Olsen to testify that, post-arrest but pre-*Miranda*, Bushyhead said, "I have nothing to say, I'm going to get the death penalty anyway," and when it allowed the prosecutor to comment on this statement in both his opening and closing arguments.

We review de novo whether references to a defendant's silence violate the Fifth Amendment privilege against self-incrimination. *United States v. Soliz*, 129 F.3d 499, 503 (9th Cir.1997), *overruled on other grounds by United States v. Johnson*, 256 F.3d 895 (9th Cir.2001). If there was an improper comment on a defendant's silence at trial, violating the Fifth Amendment privilege against self-incrimination, we apply harmless error review. *United States v. Hasting*, 461 U.S. 499, 510, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). A constitutional error may be disregarded only if it is harmless beyond a reasonable doubt. *See Neder v. United States*, 527 U.S. 1, 15, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

As recounted above, agent Olsen approached Bushyhead in the hospital with a printed *Miranda* warning in hand. Agent Olsen was permitted to testify that Bushyhead said to him, "I have nothing to say, I'm going to get the death penalty anyway." Reference to this statement occurred at three points during the trial: during the prosecution's opening statement, during agent Olsen's testimony, and during the prosecution's closing argument.

In his opening, the prosecutor said:

You're going to hear words from Special Agent Carl Olsen that when he approached the defendant-he was taken to the hospital, Washoe Med, to have his injuries attended to, that Special Agent Olsen approached the defendant, the defendant said words to the effect I'm not going to talk to you, I'm going to get the death penalty.

In direct testimony, agent Olsen said:

Q: When you saw Mr. Bushyhead at the hospital initially after the officers took him into the room, did you have any contact with him?

A: Yes.

. . . .

I entered the small cubicle in which Mr. Bushyhead was lying on a gurney type bed in a semi-sitting position. And as I approached him, I had in my hand a form we refer to as an FD395, and what it is, it's a federal form, government form, that basically contains what we refer to as your Miranda warnings. And as I approached Mr. Bushyhead with that, but before I could say anything to him or identify myself, he said, "I have nothing to say, I'm going to get the death penalty anyway."

During his closing, the prosecutor said:

Special agent Carl Olsen walks in. Before he identifies himself, before he says anything, Mr. Bushyhead says to him, I don't want to say anything, I will get the death penalty, or words to that effect. This shows he knew that he'd killed somebody. He was conscious of it, and he knew that it was very serious. Once again, not consistent with someone who's in a delirium.

Immediately after the prosecution referred to the agent's testimony in his opening, and again immediately after the agent testified to Bushyhead's remark on direct examination, the district court gave a limiting instruction. The district court gave the limiting instruction for a third time prior to the government's closing statement. Each time, the court told the jury to consider the evidence "only for the lim-

ited purpose of tending to show the defendant was conscious of having committed a homicide and for no other purpose."

Bushyhead argues that the admission of his statement at trial, even with the limiting instruction, violates his Fifth Amendment privilege against self-incrimination. We agree. "No person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "Due process requires that defendants be able to exercise their constitutional right to remain silent and not be penalized at trial for doing so." *United States v. Baker*, 999 F.2d 412, 415 (9th Cir.1993) (quoting *United States v. Negrete–Gonzales*, 966 F.2d 1277, 1280–81 (9th Cir.1992)); *see also Miranda v. Arizona*, 384 U.S. 436, 468 n. 37, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (The "prosecution may not ... use at trial the fact that [defendant] stood mute or claimed his privilege in the face of accusation.").

In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the prosecutor used testimony about a defendant's post-*Miranda* silence to impeach the defendant at trial. The Supreme Court held that the right to remain silent contains an implicit assurance "that silence will carry no penalty." *Id.* at 618, 96 S.Ct. 2240. "[I]t would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* Accordingly, the Court held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." *Id.* at 619, 96 S.Ct. 2240.

We have extended the post-arrest, post-*Miranda* silence protections in *Doyle* to the post-arrest, pre-*Miranda* context. In *United States v. Whitehead*, 200 F.3d 634 (9th Cir.2000), we held that "regardless whether the *Miranda* warnings [are] actually given, comment on the defendant's exercise of his right to remain silent [is] unconstitutional." *Id.* at 638. The defendant in *Whitehead* was taken into custody while his car was searched, but he was not read his *Miranda* rights at that time. At trial, the prosecutor elicited testimony that the defendant remained silent during this period when he was taken to a holding cell and frisked and his wallet and shoes were searched. During closing, the prosecutor argued that, because an innocent person would have protested, the defendant's silence was evidence of his guilt. The court concluded that "when the district court admitted evidence of [defendant's] post-arrest, pre-*Miranda* silence, and when it allowed the government to comment on this silence in closing argument, it plainly infringed [defendant's] privilege against self-incrimination." *Id.* at 639.

We believe that allowing the testimony that Bushyhead said "I have nothing to say, I'm going to get the death penalty anyway" impermissibly infringed on Bushyhead's constitutional right to silence. Relying on *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the government argues that Bushyhead was not silent, but rather voluntarily chose to talk to the agent. In *Innis*, police officers were transporting a suspect in a patrol car. After hearing the officers talking about the dangers a missing shotgun might pose to schoolchildren in the area, the suspect interrupted the officers and led them to the location of the missing weapon. The Court held that *Miranda* protections were not implicated because no "interrogation" had occurred.

In contrast to the statements in *Innis*, Bushyhead's statement was not an unsolicited confession but the invocation of silence itself. In the post-*Miranda* con-

text, the Court has unequivocally held that a person's statement invoking his right to silence is part of the "silence" that must be protected. "With respect to post-*Miranda* warnings 'silence,' we point out that silence does not mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted." *Wainwright v. Greenfield,* 474 U.S. 284, 294 n. 13, 106 S.Ct. 634, 88 L.Ed.2d 623 (1985). *See also United States v. Kallin,* 50 F.3d 689, 693 (9th Cir.1995) ("The reasoning of *Doyle* extends to comments on a defendant's decision to retain counsel."). Just as a prosecutor at trial cannot use the fact of defendant's post-*Miranda* silence, he also cannot use a statement such as "I'm not going to say anything," or "I'm not saying anything until my lawyer gets here."

Our holding is supported by our recent decision in *United States v. Velarde– Gomez,* No. 99–50602, 2001 WL 1262610 (9th Cir. Oct.23, 2001). In *Velarde Gomez,* the defendant was taken into custody but not given *Miranda* warnings while his car was searched. The defendant remained silent, even after being told that marijuana had been found in the car. We held that testimony and comment on his post-arrest, pre-*Miranda* silence was error. We also held that evidence of the defendant's calm and relaxed demeanor while he was detained, and when he was later informed that the search had turned up marijuana in his car, was improperly admitted because such evidence was functionally equivalent to evidence of his silence. "Whether the government argues that a defendant remained silent or describes the defendant's state of silence, the practical effect is the same-the defendant's right to remain silent is used against him at trial." *Velarde Gomez,* 2001 WL 1262610, at *5.

■ Wainwright, *Whitehead,* and *Velarde* all point to the same conclusion: The privilege against self-incrimination prevents the government's use at trial of evidence of a defendant's silence-not merely the silence itself, but the circumstances of that silence as well. The entirety of Bushyhead's statement was an invocation of his right to silence and is therefore protected by the Fifth Amendment privilege against self-incrimination. The district court thus erred in admitting the testimony of agent Olsen about Bushyhead's statement and in allowing the prosecutor to comment on this statement.

■ The next step is to determine whether the error was harmless. The test for determining whether a constitutional error is harmless is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Neder,* 527 U.S. at 15, 119 S.Ct. 1827 (quoting *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). "When deciding whether a prosecutor's reference to a defendant's post-arrest silence was prejudicial, this court will consider the extent of comments made by the witness, whether an inference of guilt from silence was stressed to the jury, and the extent of other evidence suggesting defendant's guilt." *Whitehead,* 200 F.3d at 639 (quoting *Guam v. Veloria,* 136 F.3d 648, 652 (9th Cir.1998)).

The issue in this case was not whether Bushyhead was guilty of homicide. The only issue was whether the homicide he committed was first-degree murder, second-degree murder, or manslaughter. Bushyhead argued that he could not have formed a conscious intent to kill because he was in an alcohol-induced delirium and, prior to entering the house on the night of the murder, did not know who Gardner was. Based on this argument, Bushyhead

contended that he was guilty of manslaughter or, at most, second-degree murder.

To convict Bushyhead of first-degree murder, the government was required to show premeditation, malice aforethought, and the absence of a sudden quarrel or heat of passion. Bushyhead's statement to Olsen showed that he was conscious of having done something terribly wrong. The government sought to use it both to rebut the defense psychologist's contention that Bushyhead had no memory of the crime, and to reinforce its argument that the crime was premeditated by showing that Bushyhead, shortly after the crime, was capable of rational thought and understanding. If Bushyhead's statement to agent Olsen had been a powerful piece of evidence, or one of the few pieces of evidence, showing that Bushyhead had the required mens rea for first-degree murder, we would have no hesitation in finding the district court's error not harmless. But the statement was not a particularly powerful piece of evidence, and the government's evidence, even without the statement, was very strong. The government presented the following evidence from which the jury could find that Bushyhead committed first-degree murder:

Wadsworth is a very small town, and the jury could reasonably have inferred that Bushyhead knew of Gardner's relationship with Zeigler before the evening of June 22. Even if Bushyhead did not know Gardner's name, he easily could have known that someone was having a relationship with his former girlfriend. John had a coherent conversation with Bushyhead in the evening before he went to bed. After everyone else in the John house had gone to bed, Bushyhead took John's hunting knife from the closet, unsheathed the knife, and walked with the unsheathed knife a half mile to the house on Ninth Street. When Bushyhead reached the house, he circled it at least once. He stepped in a muddy spot below the window of the bedroom where Ziegler and Gardner were sleeping. Before entering the house, Bushyhead placed one full and one half-empty vodka bottle at the corner of the house, and he took out of his pockets and put on a table a receipt, cigarettes, and a lighter. He took off his lace-up shoes and entered the house in his stockinged feet. He walked through a cluttered living room without waking a three-year-old child sleeping on the sofa.

Bushyhead stepped over an electric cord at the rear of the bed, squeezed himself into a one-foot gap between the bed and the wall, and slid into a position where he could attack Gardner. Bushyhead concentrated his thirty-nine stabs on the neck and torso of Gardner. After stabbing Gardner, Bushyhead caught the fleeing Zeigler, told her "I got something to show you," walked her back to the bedroom where Gardner lay on the bed, and asked, "Do you want this to be you?" According to Zeigler, Bushyhead appeared to be "really calm" and "pretty sober." After killing Gardner and threatening Zeigler, Bushyhead went back outside and put on his shoes. He then walked back to the John residence and hid the knife in a mop bucket. When Bushyhead awakened John after the killing, he told John that he thought he might have killed somebody.

We regard the foregoing as such strong evidence of premeditation, malice aforethought, and absence of a sudden quarrel or heat of passion (and, conversely, Bushyhead's statement to agent Olsen as such weak evidence of those elements), that we conclude that the error of admitting the statement was harmless under the standard of *Neder* and *Chapman.*

## IV

Finally, Bushyhead contends that there was insufficient evidence for the jury

to conclude beyond a reasonable doubt that he was guilty of first-degree murder. We have just recounted the evidence in our analysis of why the admission of Bushyhead's statement to agent Olsen was harmless error. That evidence was clearly sufficient to support the jury's verdict.

AFFIRMED.