HAWKINS, Circuit Judge.
We must decide whether the use of perjured testimony, the withholding of evidence that would help show the falsity of the testimony, and the reliance on the perjury by the prosecutor in final argument, alone or in combination justifies ha-beas relief.
Proceedings Below
In 1986, Petitioner Gloria Killian (“Killi-an”) was convicted in California state court of first degree felony murder, attempted murder, burglary, robbery, grand theft, and conspiracy. While serving life without possibility of parole for his role in the crime, Gary Masse bargained with the prosecution to testify against Killian. Relying upon the testimony of Masse, the jury found that Killian orchestrated the plot to steal valuables from the home of Mr. and Mrs. Ed Davies, a plot which tragically resulted in Mr. Davies’s execution-style murder in front of his wife. After unsuccessfully appealing on direct review and in collateral proceedings in state court, Killian filed a habeas petition in district court. A magistrate judge held an evidentiary hearing. He made findings and recommendations, and the district court incorporated those into its decision to deny the petition.
Facts
On December 9, 1981, Stephen DeSan-tis, disguised as a telephone repair man, entered the suburban Sacramento home of Mr. and Mrs. Davies. After manacling and hogtying the older couple, DeSantis was joined by his cousin, Gary Masse, who assisted DeSantis in ransacking the house and robbing six suitcases full of silver. During the crime, Ed Davies was shot and murdered; his wife was also shot, but she survived.
On December 14, 1981, an anonymous phone call to authorities identified DeSan-tis and Masse as the perpetrators. When officers attempted to find Masse, they encountered his wife, Joanne, who told the officers that a woman named Gloria planned the robbery.[1] Masse surrendered *1207 himself to police on December 17, 1981, the same day the police arrested Killian, a former law student with no prior criminal record. After a preliminary hearing, the charges against Killian were dismissed.
Masse, on the other hand, was convicted of first degree felony murder in May 1983 and sentenced to life without possibility of parole. Almost immediately after his sentence was imposed, Masse contacted the Sacramento Sheriffs Department to see if any deals could be struck. Assured that the state would be willing to assist in a sentence reduction, he implicated his cousin Stephen DeSantis and Killian. After volunteering his services, Masse’s sentence was recalled at the request of the prosecution, and he remained unsentenced for three years.
Killian was re-arrested in June 1983 and named as a defendant, along with Stephen DeSantis, in a seven count information three months later.[2] Killian and DeSantis were tried separately. Stephen DeSantis went first, took the stand in his own defense and testified that Killian was not involved in the crime in any way and that he had never even met or heard of Killian. He further testified that Masse had told him about a prior aborted attempt to rob the Davies family in which Gary’s wife, Joanne, went to the front door of their home and asked to use their phone. This was important because the conspiracy charge against Killian included the alleged overt act that Killian went to the door of the Davies’s residence in an unsuccessful attempt to gain entry for Masse and De-Santis sometime before the actual robbery on December 9, 1981.[3]
Masse testified at Killian’s trial in 1986. The key elements of Masse’s testimony were: (1) he had no deal or arrangement with the prosecution; (2) Killian was the “mastermind” of the plot to rob the Davies; (8) Killian accompanied Masse on the earlier attempt at the Davies’s home; and (4) Killian called Masse after learning of the robbery and murder to demand her share of the robbery proceeds. The prosecution’s only direct evidence was Masse’s testimony; without it, there was no case, as evidenced by the initial investigation into Killian’s involvement, which yielded charges that were then dismissed. Masse was, as the court below noted, the “make- or-break witness.” Killian was convicted and sentenced to thirty-two years to life in prison.
Standard and Scope of Review
The district court’s decision to deny a habeas petition is reviewed de novo. See Alvarado v. Hill, 252 F.3d 1066, 1068 (9th Cir.2001). We review the district court’s factual findings for clear error. Houston v. Roe, 177 F.3d 901, 905 (9th Cir.1999). We ordinarily presume the state court’s factual determinations to be correct. 28 U.S.C. § 2254(e)(1).
Because this habeas petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act (“AEDPA”), Pub.L. No. 104-132, 110 Stat. 1214 (1996), that statute’s standard of review applies generally to matters adjudicated on the merits in state court. AED-PA requires federal courts to deny habeas relief unless the state court ruling resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or, resulted in a decision that was based on an unreasonable determination of *1208 the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d).
For claims for which no adjudication on the merits in state court was possible, however, AEDPA’s standard of review does not apply. Hence AEDPA deference does not apply to Killian’s perjury claim in this case because the state courts could not have made a proper determination on the merits. Evidence of the perjury, after all, was adduced only at the hearing before the magistrate judge. Having refused Killian an evidentiary hearing on the matter, the state cannot argue now that the normal AEDPA deference is owed the factual determinations of the California courts. See Weaver v. Thompson, 197 F.3d 359, 363 (9th Cir.1999) (less deference accorded where the state court fails to make finding of fact); cf. Michael Williams v. Taylor, 529 U.S. 420, 444, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) (state court denial of evidentiary hearing establishes cognizable cause for procedural default in not presenting claims to the state court). Therefore, we review the district court’s factual determination on the perjury claim for clear error and the district court’s legal determination that the perjury did not violate Killian’s constitutional rights de novo.
I. The Perjury of the Prosecution’s Main Witness
The knowing use of perjured testimony by a prosecutor generally requires that the conviction be set aside. See United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury). For this case, we assume without deciding that the prosecutor neither knew nor should have known of Masse’s perjury about his deal.[4] Thus our analysis of the perjury presented at Killian’s trial must determine whether “there is a reasonable probability that [without all the perjury] the result of the proceeding would have been different.” United States v. Young, 17 F.3d 1201, 1204 (9th Cir.1994) (citing United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).
Following the evidentiary hearing held before the magistrate judge, one cannot reasonably deny that Gary Masse gave perjured testimony at Killian’s trial. Perhaps most importantly, Masse conceded that he lied at Killian’s trial about not having a verbal agreement of leniency in resentencing in exchange for testifying against Killian.[5] In addition to Masse’s recanting, other evidence confirms the existence of some agreement. For instance, never disclosed to Killian was a sealed letter by the prosecutor to Masse’s sentencing judge, which stated that Masse’s “cooperation, in my judgment, deserves consideration by the Court ... [and to] that end, the People plan not to object to a renewed Williams Motion to strike the special circumstances.”
Masse’s perjuries reached further than the mere motivation to testify at Killian’s trial. They go to the very heart of whether and to what extent Killian was involved. Masse admitted at the evidentiary hearing he lied when he described Killian at trial as the “master planner” of the robbery. He admitted he perjured himself when he told the jury that Killian called him after the robbery to demand “her share” of the robbery’s proceeds.[6] Masse’s disregard *1209 for the truth is best revealed by a letter he wrote to the prosecutor shortly after Killi-an’s trial in which he emphasized that he “lied [his] ass off on the stand” for the government.
The district court analyzed each of the perjurious statements separately. It found the level of prejudice suffered as a result of each individual statement insufficient to conclude that a reasonable juror would have had doubt about his or her verdict. The main reason offered for this conclusion is that Killian’s conviction was not based on any “material” perjured testimony. According to the district court, the perjuries were irrelevant because none “clearly” touched on Killian’s involvement in prior discussions with Masse. And because conspiracy is “in for a penny, in for a pound,” the district court thought the conviction should stand, since Masse never recanted on Killian’s purported initial involvement.
The district court cited no authority to justify applying the materiality standard so narrowly, but our task is to consider all of Masse’s lies, not just those about which the prosecution may have known. Under the Young standard, we must determine whether there is a reasonable probability that without all the perjury the result of the proceeding would have been different. In this case, the finders of fact were deprived of the fundamental inference that if Masse lied about X, Y and Z, it is quite likely that he lied about Q, R and S. Moreover, Masse’s testimony was virtually the whole case for the government. Given his motivation and penchant for lying, it is unreasonable to accept at face value the assurances Masse gave at the federal evi-dentiary hearing; indeed doing so surely deprives Killian of her right to a trial by jury, and compounds the constitutional error. See Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
In short, Masse’s testimony was the product of someone with incentives to lie for himself and his wife’s sake. He admitted “l[ying his] ass off’ at the trial to procure leniency at resentencing later. He admitted that telling the truth would have taken Killian out of participating in the crime. He admitted that “I couldn’t tell the truth because there would have been no more deals. I wouldn’t have come through for them.” He admitted he even perjured himself when he told the jury he was being truthful and wanted to set the record straight. The prosecution, for its part, took advantage of Masse’s perjury regarding his deal, arguing at closing that: “we have nothing to do with how much time Gary Masse serves.”
While the prosecution may well have known that Masse lied about the existence of a deal, such a belief is not necessary to our holding here. Under the Young standard, we must look to the cumulative effect of Masse’s lies. “[A] government’s assurances that false evidence was presented in good faith are little comfort to a criminal defendant wrongly convicted on the basis of such evidence. A conviction based in part on false evidence, even false evidence presented in good faith, hardly comports with fundamental fairness.” Young, 17 F.3d at 1203-04. Because Masse perjured himself several times and because he was the “make-or-break witness” for the state, there is a reasonable probability that, *1210 without all the perjury, the result of the proceeding would have been different. See id. In sum, it cannot be said “with fair assurance, ... that the judgment was not substantially swayed by the error.” O’Neal v. McAninch, 513 U.S. 432, 437-38, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).[7]
II. Failure to Disclose Impeachment Evidence
If exculpatory or impeachment evidence is not disclosed by the prosecution and prejudice ensues, a defendant is deprived of due process. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Prejudice is determined by looking at the cumulative effect of the withheld evidence and asking “whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.” Strickler v. Greene, 527 U.S. 263, 290, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (citations and internal quotation marks omitted).
Three undisclosed letters are signally important here. First is a letter from May 13, 1984, in which Masse expressed concern for the safety of his wife, Joanne. Killian explains this would have been useful to show Masse inculpated Killian to keep Joanne Masse out of prison, a relevant point since, according to Stephen DeSantis, it was Joanne'who participated in the first attempted robbery of the Davies’s residence. A second letter by Masse, dated April 21, 1986, written after Killian’s trial, is a reflection of Masse’s state of mind during his testimony. This letter states flatly: “I gave you De Santis and Killian.... I even lied my ass off on the stand for you people.”
The third and perhaps most important letter was, as noted earlier, the prosecution’s sealed letter of April 1985, in which the government stated its intention to support Masse’s resentencing as a result of his cooperation. Although it might not have been disclosed to Masse, and therefore not sufficient to constitute a plea bargain, the letter would still have been valuable to the defense in impeaching Masse’s credibility before the jury. The undisclosed material, considered collectively, exposed Masse’s motivation to lie and tended to show that he did lie.
The government responds that none of the undisclosed evidence relates to the core facts establishing Killian’s guilt, or establishes that Masse was impeachable beyond what was accomplished at trial. But the only way Masse’s later admission that he “lied [his] ass off’ does not cast doubt upon his earlier testimony is if one believes the witness was thoroughly discredited to begin with.[8] If the “make-or-■break” Masse was thoroughly discredited, then the evidence was plainly insufficient to convict Killian. Alternatively, if one looks at the “core facts establishing Killi-an’s guilt,” the chief evidence of those “core facts” derives, again, from the now thoroughly discredited Gary Masse.
Consequently, we view the determination by the state courts and the district court that there was insufficient prejudice to be firmly wrong and an unreasonable application of the law to the facts.
*1211 III. Prosecutorial Commentary on Privileged Conduct
Killian was questioned about the crime on December 16, 1981. She spoke to the police for two hours. After speaking to them, Killian was arrested. After being told she had a right to remain silent, she invoked that right. During cross-examination and at closing argument, the prosecution contended — no less than eight separate times — that Killian had something to hide by becoming silent upon arrest. Killian claims that the state court’s decision flouts Doyle v. Ohio, 426 U.S. 610, 611, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and thereby warrants reversal of the district court’s decision to deny habeas relief.
Since a defendant who is given [a Miranda] warning is implicitly being told that no penalty will be imposed against him for choosing to exercise the right to remain silent, the Fourteenth Amendment Due Process Clause has thus been interpreted to prohibit the use of a defendant’s post-warning silence for impeachment purposes.
United States v. Pino-Noriega, 189 F.3d 1089, 1098 (9th Cir.1999) (citing Doyle v. Ohio, 426 U.S. 610, 618-19, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976)); see also United States v. Bushyhead, 270 F.3d 905 (9th Cir.2001).
The district court relied on McMillan v. Gomez, 19 F.3d 465 (9th Cir.1994), which clarified the dimensions of Doyle, permitting the prosecution to refute the impression of cooperativeness by asking about later noncooperativeness. But the McMillan circumstances are not present here. In McMillan, the defendant waived his Miranda rights upon his arrest by agreeing to talk, whereas Killian cooperated for two hours, and, only upon arrest, invoked the very rights Miranda promises.
In light of rulings protecting privileged conduct in cases such as Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (commenting on defendant’s refusal to testify) and United States v. Prescott, 581 F.2d 1343, 1352 (9th Cir.1978) (commenting on defendant’s refusal to consent to search), we apply Doyle for the proposition that if a person is told she can exercise her right to be silent whenever she wants without penalty, she should not be badgered by a prosecutor eight times, as she was here, about whether she has “something to hide” by exercising that right. McMillan says the prosecution can rebut a defendant’s attempt to paint herself as cooperative after a defendant has been arrested and has waived her Miranda rights, but it says nothing about hectoring a defendant where cooperation was asserted only before her arrest. The core of Doyle is to protect a privilege. McMillan’s facts fall outside the zone of Doyle, whereas Killian’s silence is squarely within it. The determination of this issue by the state and district courts was contrary to established Supreme Court law.
IV. Cumulative Error
Even if the failure to disclose impeachment evidence, Masse’s perjury, and the prosecutor’s comments on privileged conduct were not each sufficient to justify habeas relief, we note that if ever there were a case for application of cumulative error principles, this is it. The collective presence of these errors is devastating to one’s confidence in the reliability of this verdict and therefore requires, at the very least, a new trial. For even if no single error were prejudicial, where there are several substantial errors, “their cumulative effect may nevertheless be so prejudicial as to require reversal.” United States v. de Cruz, 82 F.3d 856, 868 (9th Cir.1996); see also Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir.1992).
Conclusion
The district court’s denial of Killian’s habeas petition is reversed, and we remand to the district court with instructions to grant the writ unless the state grants *1212 Killian a new trial within a reasonable time.
REVERSED and REMANDED.

. Gary Masse later testified that he and his wife, Joanne, had, two months prior to the Davies robbery, attempted an armed robbery of Elizabeth Lee's house. Joanne was wearing a wig but the victim of the attempted robbery identified both Gary and Joanne. (The robbery attempt was foiled because Ms. Lee had a gun, which scared off the Masses.)

. Stephen’s brother, Robert, was also charged for his lesser role in the Davies robbery, but he agreed to a plea in exchange for testimony at Stephen's trial. He did not testify at Killi-an’s trial. Although testimony from DeSantis’ trial was not introduced at Killian's trial, it was introduced in the habeas hearing before the district court.

. Mrs. Davies testified at Killian's trial, describing the pre-robbery appearance of a woman at her door. She could not identify Killian as that person.

.The evidence indicating that the prosecution should have known about Masse's perjury about his alleged deal is significant, but it is a matter that is contested by the government. Resolution of this factual dispute is unnecessary to our holding, so we abstain from ruling on it.

. At trial, Masse testified that "there weren't no bargains made” in return for his testimony.

. The magistrate judge acknowledged the perjury regarding the "especially ... outright falsehood about petitioner still sharing in the proceeds.” However, the magistrate judge *1209 overlooked the significance of this perjury. Indeed, shortly thereafter, the judge stated that Killian "continued to believe herself part of the conspiracy and entitled to part of the robbery proceeds.” But the only basis for thinking Killian believed herself to be “entitled to part of the robbery proceeds” is the testimony of Masse, whom the judge just concluded perjured himself on that very point. Further, the "corroborating” statement found by the magistrate was Killian’s comment, after hearing a TV report about the robbery-murder, "Oh, my God, look at that.” But this statement does nothing in the way of advancing the claim that Killian viewed herself as entitled to the proceeds of the robbery, or, for that matter, had anything to do with it.

. Our skepticism toward the reliability of the verdict is bolstered by the sworn, prior testimony of Stephen DeSantis. Having no apparent motive to do so, DeSantis exonerated Killian of any participation in the robbery-murder. Although this testimony never came into Killian's trial, it was before the district court in the only evidentiary hearing which considered the impact of the post-trial discoveries discussed herein.

. We recognize that because of the timing of Masse’s admission about his prior untruthfulness, it would only have been useful to Killian on direct or collateral appeals.