**Youry G. GOMEZ, Petitioner,**

v.

**Derral G. ADAMS, Warden, Respondent.**

**No. CV 01–10216 CAS (AJW).**

United States District Court, C.D. California, Western Division.

May 15, 2008.

Youry G. Gomez, Corcoran, CA, pro se.

Jaime L. Fuster, Kenneth N. Sokoler, Susan Lee Frierson, Suzann E. Papagoda, Viet H. Nguyen, CAAG–Office of Attorney General of California Los Angeles, CA, for Respondent.

## ORDER ADOPTING REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

CHRISTINA A. SNYDER, District Judge.

The Court has reviewed the entire record in this action, the Report and Recommendation of Magistrate Judge ("Report"), and petitioner's objections. The Court concurs with and adopts the findings of fact, conclusions of law, and recommendations contained in the Report after having made a *de novo* determination of the portions to which objections were directed.

**REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE**

ANDREW J. WISTRICH, United States Magistrate Judge.

## I. Background

### A. Procedural History

On July 17, 1998, in Los Angeles County Superior Court Case No. BA12688, a jury found petitioner guilty of one count of first-degree murder (Cal.Penal Code § 211) and found true the allegation that he personally used a firearm in committing the murder (Cal.Penal Code § 12022.5(a)). [Clerk's Transcript ("CT") 184–185; Reporter's Transcript ("RT") 1070–1072.] The trial court sentenced petitioner to 29 years to life in state prison. [CT 188, 190; RT 1093–1094.]

Petitioner appealed to the California Court of Appeal, which affirmed the judgment on March 8, 2000. [Answer Exhibit ("Ex.") B at 10–19.]

On April 12, 2000, petitioner filed a petition for review in the California Supreme Court, which was denied on June 28, 2000, without comment or citation to authority. [Answer, Exs. C at 20–47, D at 48.]

On May 10, 2001, petitioner filed a habeas corpus petition in the California Supreme Court, which was denied on October 31, 2001, without comment or citation to authority. [Answer, Exs. E at 49–59, F at 60.].

On November 28, 2001, petitioner filed in this court a habeas corpus petition ("the Petition"). The case was stayed to permit petitioner to exhaust his state remedies with respect to some of his claims and a second stay was granted to permit petitioner to exhaust a "newly discovered" claim. Petitioner filed an amended supplemental memorandum on July 5, 2006, and an amended petition on July, 21, 2006. Respondent filed a supplemental answer on January 4, 2007.

### B. Trial Evidence[1]

#### 1. Prosecution Case

On January 19, 1996, Maria Aguilar ["Aguilar"] drove with her boyfriend Eduardo Mejia ["Mejia"] to an apartment complex on Figueroa Street to visit a friend named Rojo. Aguilar's three-year-old daughter was in the car. When they arrived at the complex, the gate was open so Mejia drove in and parked at the back of the complex. Aguilar noticed [petitioner] was there, standing next to his car, a blue Thunderbird. Aguilar had known [petitioner] for a year; they had met because [petitioner] was a bus driver, and Aguilar used to live across the street from an RTD facility. Aguilar had introduced Mejia to [petitioner] about five months before the incident. Aguilar had not witnessed any arguments between [petitioner] and Mejia before.

Mejia told Aguilar he was going to talk to [petitioner]. Mejia said, "Whatever happens, don't get off [sic] the car." Mejia exited the car and went over to [petitioner]. Aguilar turned back to watch the conversation, and she could tell [the] two men were arguing. At first, Mejia was silent as [petitioner] said very loudly he wanted his gun back. [Petitioner] then turned and walked to the car. As Aguilar got out of her car, she saw [petitioner] walk towards Mejia with a black gun in his hand. Mejia shouted, "Don't kill me because my girlfriend's pregnant." [Petitioner] replied, "Don't fuck with me." Mejia said, "I

---

1. The following summary is taken from the opinion of the California Court of Appeals. Petitioner does not attack the sufficiency of the trial evidence, nor does he allege that the state appellate court's summary is inaccurate. Furthermore, the Court's independent review of the record confirms the accuracy of the appellate court's summary of the evidence.

have your gun. I have it at home and I'm going to give it back to you." [Petitioner] said, "I don't want the gun. It's too late." [Petitioner] then shot Mejia in the abdomen once, and Mejia fell to the ground.

Aguilar returned to her car and carried her daughter over to [petitioner]. Aguilar watched as [petitioner] put the gun to Mejia's face. Aguilar begged [petitioner] not to shoot Mejia again. [Petitioner] told Aguilar not to get involved. [Petitioner] returned to his car and drove away. The gate to the parking lot was closed. [Petitioner] got out of his car and tried to pull the gate open. When [petitioner] was unsuccessful, he got back into his car, rammed the gate open and made his escape. Mejia died at the hospital from blood loss due to a gunshot wound. Five days later, [petitioner] left the country, leaving his wife and children, and fled to his native Brazil.

Between 8 and 9 p.m., Alicia Ayala ["Ayala"], a resident of the apartment complex, heard loud voices while she was in her kitchen so she looked out the window and saw two men [and] a woman standing near some parked cars. Ayala could only see [petitioner] from the back. Ayala went to [a] larger window. Mejia kept saying, "Calm down. I have this." Aguilar also said, "Calm down," and "Don't kill him." Ayala saw [petitioner] put a gun to Mejia's stomach. Ayala heard a gunshot. Ayala ducked down and instructed her daughter to call 9–1–1.

On December 9, 1997, United States Immigration inspectors detained [petitioner] at San Ysidro. [Petitioner], who gave his name as "John Reyes," did not have any identification. After [petitioner's] fingerprints were taken and tested, the inspectors discovered [petitioner] was a fugitive and took him into custody.

## 2. The Defense

[Petitioner] testified that he did not shoot Mejia. On January 19, [petitioner] spent the afternoon at the house of a friend, Jose Guevarra. At about 8:30 p.m., [petitioner] left there and went to a liquor store on the corner of Figueroa and Marmion Way to buy beer and see if he could get some "speed." [Petitioner] had never bought speed there before, but he knew some of the people who hung out there. [Petitioner] talked to a couple of the men there, one of whom went by the name of "Shadow." Shadow said he knew where he could get the drug. The two men drove in [petitioner's] car to an apartment complex on Figueroa. Rojo, with whom [petitioner] was acquainted, lived there. [Petitioner] knew Rojo was a drug dealer, but [petitioner] thought Rojo sold only rock cocaine.

[Petitioner] pulled into a stall and gave Shadow $20 with which to buy the drugs. The two men got out of the car. [Petitioner] saw Mejia pull into the parking lot. As Shadow was walking toward the back of the complex, Mejia came up to [petitioner] and asked for $10. Mejia, who knew [petitioner] had a job, had asked [petitioner] for money in the past. [Petitioner] told Mejia that he had just given all his money to Shadow to buy speed for him. Mejia warned [petitioner] that he had better get the $10 back. [Petitioner] called to Shadow to return, which he did. When [petitioner] directed Shadow to give Mejia the $10, Shadow answered, "I ain't giving shit," whereupon Mejia replied, "If you don't give the $10 back, I'm going to take all your money."

As the argument escalated, Shadow pulled out a black revolver and shot Mejia as Mejia was still pulling out his own semi-automatic, which he dropped

as he fell to the ground. Shadow ran away; [petitioner] heard Aguilar scream; [petitioner] panicked and grabbed Mejia's gun out of fear that Mejia, who was still alive, would shoot him. Jumping into his car, [petitioner] stopped at the gate, tried to pull it open by hand, but when he could not move it, he rammed through the gate with his car. [Petitioner] threw Mejia's gun on the freeway.

[Petitioner] fled to Brazil, where he stayed until he decided to turn himself in. [Petitioner] gave a false name in San Ysidro in an attempt to allow himself time to spend Christmas with his family before he surrendered.

[Answer Ex. B at 11–13.]

## II. Petitioner's Contentions

Petitioner alleges the following grounds for relief:

1. The trial court's failure to instruct *sua sponte* on the burden of proof for an affirmative defense deprived petitioner of his rights to due process and a fair trial. [Amended Petition 11–14.]

2. The trial court deprived petitioner of his right to present a defense by limiting evidence about his state of mind. [Amended Petition 15–20.]

3. Petitioner was denied the effective assistance of counsel because his attorney (1) failed to request a jury instruction modifying the standard instruction on reasonable doubt by "pinpointing" petitioner's defense of third-party culpability; (2) failed to present evidence in support of petitioner's defense of third-party culpability; (3) failed to present mitigating evidence at the sentencing hearing; and (4) failed to impeach Aguilar with prior criminal acts, her use of aliases, or her probationary status. [Amended Petition 21–26; Amended Supplemental Petition 6–20.]

4. The prosecutor committed misconduct by knowingly using the perjured testimony of Aguilar. [Amended Petition 27–30.]

5. The prosecutor committed misconduct by failing to disclose Aguilar's criminal history and probationary status. [Amended Supplemental Petition 22–32.]

6. The state courts abused their discretion in denying petitioner discovery in his state habeas proceedings. [Amended Supplemental Petition 33–35.]

## III. Standard of Review

This case is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Rios v. Rocha,* 299 F.3d 796, 799 n. 4 (9th Cir. 2002). Under the AEDPA, a federal court may not grant a writ of habeas corpus on behalf of a person in state custody "with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

Section "2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning." *Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas court may grant the writ if the state court "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of the Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor,* 529 U.S. 362, 405–406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see also Price v. Vincent,* 538 U.S. 634, 639–640, 123 S.Ct. 1848,

155 L.Ed.2d 877 (2003); *Lockyer v. Andrade*, 538 U.S. 63, 75–76, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); *Early v. Packer*, 537 U.S. 3, 7–8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam). Under the "unreasonable application" clause, a federal court may grant a writ of habeas corpus if the state court identified the correct governing legal principles from this Court's decisions but applied those principles to the facts of the case in an "objectively unreasonable" manner. *Andrade*, 538 U.S. at 75–76, 123 S.Ct. 1166; *Woodford v. Visciotti*, 537 U.S. 19, 24–25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam); *Bell*, 535 U.S. at 689, 122 S.Ct. 1843; *Williams*, 529 U.S. at 411, 120 S.Ct. 1495.

While Supreme Court precedent is the only authority that is controlling under the AEDPA, this Court may look to Ninth Circuit case law as persuasive authority "for purposes of determining whether a particular state court decision is an unreasonable application of Supreme Court law." *Vlasak v. Superior Court of California ex rel. County of Los Angeles*, 329 F.3d 683, 687 (9th Cir.2003) (quoting *Luna v. Cambra*, 306 F.3d 954, 960 (9th Cir.) (internal quotation marks and citation omitted), *amended*, 311 F.3d 928 (9th Cir.2002)).

The AEDPA also provides that state court findings of fact are presumed to be correct unless petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Finally, where a higher state court has denied a claim without explanation, this Court "looks through" that denial to the last reasoned state decision. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–06, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n. 2

(9th Cir.2000), *cert. denied*, 534 U.S. 944, 122 S.Ct. 324, 151 L.Ed.2d 242 (2001). When there is no state court decision articulating a rationale, a reviewing court "has no basis other than the record" for determining whether the state court decision merits deference under 28 U.S.C. § 2254(d) (1). *Delgado v. Lewis*, 223 F.3d 976, 981–82 (9th Cir.2000). In such circumstances, a reviewing court can still apply the "objectively reasonable" standard of *Williams* to the state court decision. This does not allow *de novo* review by the federal court, but rather "an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law." *Bailey v. Newland*, 263 F.3d 1022, 1029–1030 (9th Cir.2001), *cert. denied*, 535 U.S. 995, 122 S.Ct. 1556, 152 L.Ed.2d 479 (2002); *Delgado*, 223 F.3d at 982.

## IV. Discussion[2]

### A. Failure to Instruct on Affirmative Defense Burden of Proof

Petitioner asserts that the trial court failed to instruct *sua sponte* on the burden of proof for an affirmative defense, thereby depriving him of his rights to due process and a fair trial. [Petition 3–4].

The fact that a jury instruction is allegedly incorrect under state law is not a basis for federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 71–72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). A constitutional violation exists only when an erroneous instruction "by itself so infected the entire trial that the resulting conviction violates due process." *McGuire*, 502 U.S. at 72, 112 S.Ct. 475; see *Henderson v. Kibbe*, 431 U.S. 145, 154–157, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977); *Cupp v.*

---

**2.** Respondent argues that portions of petitioner's claim are untimely and procedurally defaulted. Because petitioner is not entitled to relief on the merits of his claim, the Court need not reach the procedural issues. *See*

*Lambrix v. Singletary*, 520 U.S. 518, 525, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997) (explaining that district court may address the merits without reaching procedural issues where the interests of judicial economy are best served).

*Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *Turner v. Calderon,* 281 F.3d 851, 865–866 (9th Cir.2002). This constitutional standard for instructional error applies to ambiguous or omitted instructions. *Murtishaw v. Woodford,* 255 F.3d 926, 971 (9th Cir.2001), *cert. denied,* 535 U.S. 935, 122 S.Ct. 1313, 152 L.Ed.2d 222 (2002). "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *McGuire,* 502 U.S. at 72, 112 S.Ct. 475 (citation omitted); *see Cupp,* 414 U.S. at 146–147, 94 S.Ct. 396. Moreover, where the alleged error is the failure to give an instruction, the burden on the petitioner is "especially heavy." *Henderson,* 431 U.S. at 155, 97 S.Ct. 1730; *accord Villafuerte v. Stewart,* 111 F.3d 616, 624 (9th Cir.1997), *cert. denied,* 522 U.S. 1079, 118 S.Ct. 860, 139 L.Ed.2d 759 (1998); *see also Duckett v. Godinez,* 67 F.3d 734, 746 (9th Cir.1995) ("We ask whether, under the instructions as a whole and given the evidence in the case, the failure to give the requested instruction rendered the trial so fundamentally unfair as to violate federal due process."), *cert. denied,* 517 U.S. 1158, 116 S.Ct. 1549, 134 L.Ed.2d 651 (1996).

■ Furthermore, habeas relief on a claim of instructional error is not available unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)); *Karis v. Calderon,* 283 F.3d 1117, 1132 (9th Cir.2002), *cert. denied,* 539 U.S. 958, 123 S.Ct. 2637, 156 L.Ed.2d 655 (2003); *Murtishaw,* 255 F.3d at 973.

■ Petitioner contends that the trial court erroneously failed to instruct the jury, on its own motion, that "the accused had only a burden to raise a reasonable doubt as to the issue of third-party culpability." [Amended Petition 11–12.] This contention fails for several reasons:

First, petitioner has not identified any authority supporting the proposition that the federal constitution imposes any such *sua sponte* obligation to instruct upon the trial court.

Second, insofar as petitioner is claiming that instructional error under California law has occurred, such purported error is not a basis for federal habeas relief. *See McGuire,* 502 U.S. at 71–72, 112 S.Ct. 475. In any event, the California Court of Appeal concluded that no instructional error resulted from the trial court's failure to instruct the jury as petitioner now argues it should have. [Answer Ex. B at 16–18.] This Court is bound by the state court's determination that the omitted instruction was not warranted under state law. *See Bradshaw v. Richey,* 546 U.S. 74, 76, 126 S.Ct. 602, 163 L.Ed.2d 407 (2005) (per curiam) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Murtishaw,* 255 F.3d at 956 (deference must be given to the state supreme court's interpretation of state law governing jury instruction).

Finally, the instructions that the trial court gave the jury covered the very ground that petitioner alleges required further instruction. The jury heard the following instructions on the prosecutions's "reasonable doubt" burden of proof:

A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places

upon the People the burden of proving him guilty beyond a reasonable doubt.

Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.

[CT 141; RT 1044–1045; CALJIC 2.90.]

The burden is on the People to prove beyond a reasonable doubt that the defendant is the person who committed the crime with which he is charged.

If, after considering the circumstances of the identification and any other evidence in this case, you have a reasonable doubt whether defendant was the person who committed the crime, you must give the defendant the benefit of that doubt and find him not guilty.

[CT 142; RT 1045; CALJIC 2.91.]

The jury also received CALJIC 2.92, which delineated factors for the jury to consider in determining the weight to be given eyewitness identification.[3]

As the state appellate court reasonably concluded, in view of the instructions given, "the jury could not have mistakenly believed [petitioner] had to do more than raise a reasonable doubt he was the one who did the shooting."[4] [Answer Ex. B at 18.] For these reasons, petitioner is not entitled to relief on the basis of this claim.

## B. Exclusion of Evidence As to Petitioner's State of Mind

Petitioner alleges that the trial court deprived him of his right to present a defense by limiting the admission of evidence as to his state of mind. In particular, petitioner alleges that he was deprived of the opportunity to explain to the jury

---

**3.** CALJIC 2.92, as given, states:

Eye witness testimony has been received in this trial for the purpose of identifying the defendant as the perpetrator of the crime[s] charged.

In determining the weight to be given eye witness identification testimony[,] you should consider the believability of the witness as well as other factors which bear upon the accuracy of the witness' identification of the [ ] defendant, including, but not limited to, any of the following:

The opportunity of the witness to observe the alleged criminal act and the perpetrator of the act;

The stress[,] if any[,] to which the witness was subjected at the time of the observation;

The witness' ability[,] following the observation[,] to provide a description of the perpetrator of the act;

The extent to which the defendant either fits or does not fit the description of the perpetrator previously given by the witness;

The cross-racial or ethnic nature of the identification;

The witness' capacity to make an identification;

Evidence relating to the witness' ability to identify other alleged perpetrators of the criminal act;

Whether the witness was able to identify the alleged perpetrator in a photographic or physical lineup;

The period of time between the alleged criminal act and the witness' identification;

Whether the witness had prior contacts with the alleged perpetrator;

The extent to which the witness is either certain or uncertain of the identification;

Whether the witness' identification is in fact the product of his own recollection;

Any other evidence relating to the witness' ability to make an identification.

[CT 143; RT 1045–1047.]

**4.** The jury is presumed to have followed the trial court's instructions. See *Richardson v. Marsh*, 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *Wade v. Calderon*, 29 F.3d 1312, 1321 (9th Cir.1994), *cert. denied*, 513 U.S. 1120, 115 S.Ct. 923, 130 L.Ed.2d 802 (1995).

why he "so readily abated his purchase of methamphetamine merely to satisfy Mejia's unaccountable request for $10." [Amended Petition 16.]

### 1. Due Process Standard for Admissibility

■ A federal court cannot review questions of state evidence law. *McGuire,* 502 U.S. at 67–68, 112 S.Ct. 475; *Henry v. Kernan,* 197 F.3d 1021, 1031 (9th Cir. 1999), *cert. denied,* 528 U.S. 1198, 120 S.Ct. 1262, 146 L.Ed.2d 117 (2000); *Windham v. Merkle,* 163 F.3d 1092, 1103 (9th Cir.1998). "It is well settled that a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it is so fundamentally unfair as to violate due process." *Spivey v. Rocha,* 194 F.3d 971, 977 (9th Cir.1999), *cert. denied,* 531 U.S. 995, 121 S.Ct. 488, 148 L.Ed.2d 461 (2000); *accord Mancuso v. Olivarez,* 292 F.3d 939, 956 (9th Cir.2002); *Dillard v. Roe,* 244 F.3d 758, 766 (9th Cir.), *cert. denied,* 534 U.S. 905, 122 S.Ct. 238, 151 L.Ed.2d 172 (2001).

■ Nevertheless, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." *Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (citations omitted). In the "absence of any valid state justification," the exclusion of "competent, reliable" exculpatory evidence that is "central to the defendant's claim of innocence" "deprives a defendant of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.'" *Crane,* 476 U.S. at 690–691, 106 S.Ct. 2142; *accord Montana v. Egelhoff,* 518 U.S. 37, 53, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996); *see also Thomas v. Hubbard,* 273 F.3d 1164,

1177 (9th Cir.2001) ("Evidence that someone other than the defendant may have committed the crime is critical exculpatory evidence that the defendant is entitled to adduce."), *overruled on other grounds by, Payton v. Woodford,* 299 F.3d 815 (9th Cir.2002) *and Mancuso v. Olivarez,* 292 F.3d 939 (9th Cir.2002).[5] However, "the Constitution leaves to the judges who must make [decisions concerning the admissibility of evidence] 'wide latitude' to exclude evidence that is 'repetitive . . ., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Crane,* 476 U.S. at 689–690, 106 S.Ct. 2142 (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). "[W]e have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted." *Crane,* 476 U.S. at 690, 106 S.Ct. 2142 (citing *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)).

### 2. Petitioner's Testimony about Mejia's Money Demand

**Direct Examination.** The issue of Mejia's[6] request or demand for money from petitioner was raised during the following direct examination of petitioner:

[DEFENSE COUNSEL] What was Shadow doing at the time Pelon was walking from his car to where you were?

A First he was standing next to me.

Q Then what did he do? [¶] What happened next?

---

5. The unconstitutional exclusion of trial testimony that is "central" to a defendant's defense is subject to harmless error analysis under the *Brecht* standard. *Gill v. Ayers,* 342 F.3d 911, 921 (9th Cir.2003).

6. Mejia was also known as Pelon [*See* RT 791.]

A Then Pelon walked up to me and asked me for $10.

Q Now what was he asking you for $10 for?

A He never said what he wanted $10 for.

Q In the past had Pelon ever confronted you for money?

[PROSECUTOR]: Objection; relevancy.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Pelon came up to you and asked you for money?

A Yes.

Q Was that the first time that particular event ever occurred?

A No.

Q When Pelon asked you for money, what was said next and by who?

A I answered him I couldn't give him no money because I didn't have no more money.

Q What was said next?

A I told him I gave my last $20 to Shadow to go buy $20 worth of speed for me.

Q What happened next?

A He said, "You better get $10 back."

Q Who said that?

A Pelon.

Q Pelon said Shadow better give $10 back?

A He said I better get $10 back.

Q The $10 Pelon wanted?

A Yes.

Q Where was Shadow?

A When Pelon started talking to me, he started walking toward the back.

* * *

Q After Pelon said to you that you better get $10 back, what happened next?

A I called Shadow back.

Q What did you say?

A "Come here. I want to talk to you."

* * *

Q When Shadow came back, what happened? Who spoke first?

A Pelon did.

Q What did Pelon say?

* * *

A Pelon said, "You better give him the $10 back." He goes, "Now"—

Q Let me stop you. [¶] Pelon said, "You better give him the $10 back?"

A Yes.

Q Who was he saying that to?

A To Shadow.

Q And what did Shadow say or who spoke next and what was said?

A Shadow spoke next.

Q What did Shadow say?

A He said, "I ain't giving shit." [¶] Pelon said, "If you don't give the $10 back, I'm going to take all your money."

Q And Pelon said that to Shadow?

A Yes.

Q Then what happened?

A Shadow said, "Fuck you. I ain't going to give you shit."

Q Who said that?

A Shadow.

Q Then what happened?

A Then Shadow pulled out a gun.

* * *

Q When Shadow pulled out that gun, what happened next?

A Pelon tried to pull his gun out, too.

* * *

Q As Shadow is pulling out his gun and Pelon is pulling out his, what happened next?

A Shadow just shot him.

[RT 802–803, 805, 810–811, 813–814; *see* Answer Ex. B at 13.]

**Cross–Examination.** The prosecutor explored the same subject during the following cross-examination of petitioner:

Q And according to your testimony yesterday, you told Eduardo Mejia that you couldn't give him any money. [¶] Do you remember saying that?

A Yes.

Q And you also told Eduardo Mejia that you had given your $20 to Shadow. [¶] Do you remember telling us that yesterday?

A Yes, I do.

Q Now, at that time, did you think Eduardo Mejia was trying to rob you?

[DEFENSE COUNSEL]: It assumes a legal conclusion.

THE COURT: Overruled. It is for state of mind. [¶] Did you think you were being robbed?

THE WITNESS: No.

THE COURT: Next question.

[THE PROSECUTOR]: After Eduardo asked you for the money, at that point you called Shadow back.

A Well, no. [¶] After he asked me for the second time, I called Shadow back.

Q When you called Shadow back, you asked him for some of the money back?

A Yes.

Q At that point, did you decide you didn't need the drugs anymore?

A No.

Q Why did you ask Shadow for some of the money back?

A Because I was going to give Pelon $10.

[RT 894–895.]

[THE PROSECUTOR]: Had Eduardo Mejia ever threatened to shoot you before?

A One time.

Q Yesterday you testified that you knew Eduardo Mejia?

A Yes.

Q You also testified that you never fought with him before?

A I never did.

Q Do you think when someone threatens to shoot you they are fighting with you?

A No.

Q Do you think you were telling the truth yesterday when you said that you and Eduardo Mejia had never fought before?

\* \* \*

THE COURT: Were you telling the truth when you said that?

THE WITNESS: Yes, I was.

\* \* \*

Q Your testimony today is that at least on one prior occasion Eduardo Mejia threatened to shoot you?

A No, he pointed a gun at me.

Q At least on one prior occasion Eduardo Mejia pointed a gun at you?

A Yes, he did.

Q Had Eduardo Mejia when he asked you for money, had he made any sort of threats to you?

A When?

THE COURT: The date of the shooting.

[THE PROSECUTOR]: On January 19, 1996, when Eduardo Mejia walked up to you at 3401 and 3405 North Figueroa and asked you for money—

THE COURT: Maybe you can say, "The apartment complex." I don't think the address is necessary each and every time.

[THE PROSECUTOR]:—at the apartment complex and asked you for money, did he make any sort of threats to you?

A No.

Q Had he tried to kill you?

A No, sir.

[RT 900–902; *see* Answer Ex. B at 13.]

**Redirect Examination.** The following examination and colloquy with the trial court occurred during redirect examination of petitioner:

[DEFENSE COUNSEL]: The district attorney—well, before we get there— the district attorney raised some issues as to why it would be that you would call Shadow back to give Pelon $10 of your money, and you were being asked whether you thought you were robbed. [¶] Did Pelon in the period of time you knew him prior to January 19 ever try to get money from you before?

A Yes, he did.

Q As of January 19, did Pelon scare you at all?

A What is the question again?

THE COURT: As of January 19, did Pelon scare you at all?

THE WITNESS: Yeah, a little bit.

[DEFENSE COUNSEL]:

Q I assume between the time you first met him [and] on January 19th when he came up to you to ask you for some of your money, he had done some things to scare you?

A Yes, he did.

What was it about him—

THE COURT: Could I see counsel at the bench.

(THE FOLLOWING PROCEED- INGS WERE HELD AT THE BENCH.)

THE COURT: Is this something [the prosecutor] is aware of or new discovery about prior acts of the victim?

[DEFENSE COUNSEL]: Well, [the prosecutor] brought out on direct examination that Mr. Mejia threatened my client with a gun. [¶] I don't know if you were on the phone.

THE COURT: No, I heard it. I had a couple of quick calls that came through.

[DEFENSE COUNSEL]: What is going to come out is they have a history where Pelon—well, he doesn't call it robbery. The D.A. raised the issue.

THE COURT: Forgetting about who raised it, what is the offer of proof?

[DEFENSE COUNSEL]: That Pelon has a history of kind of strong-arming my client for money because my client works. So it is not the first incident. It is not like my client had no reason to give it. It is that Pelon's prior actions threatened my client enough that when he was asked on this occasion, he felt nervousness, which is his motivation for calling Shadow back.

THE COURT: Keep in mind there wasn't an objection, but it cuts both ways. It could give your client a motive if he had a gun with him. [¶] There is no objection? [¶] Do what you want?

[THE PROSECUTOR]: I'm going to object as to materiality.

THE COURT: I think you brought out, "Were you afraid of him?" And you expected the answer to be, "No." The question was did he think that Pelon was there to rob him? [¶] I don't want to go into things where somebody could paint somebody the worse guy in the world since your guy isn't claiming self-defense.

[DEFENSE COUNSEL]: I will go very briefly into prior requests for money.

THE COURT: Just as far as he asked him for money and he has given it to him.

[DEFENSE COUNSEL]: To deal with the issue raised by the D.A. of why he would agree to give him money, that there is a history. Not like the D.A. suggested. Why would Pelon just ask him.

THE COURT: Basically, "You gave him money on this occasions, and had you on past occasions?"

[DEFENSE COUNSEL]: He had asked for money.

THE COURT: Okay.

[DEFENSE COUNSEL]: May I proceed?

THE COURT: Yes.

(THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT:)

[DEFENSE COUNSEL]: On prior occasions, did Pelon ask you for money?

A Yes.

Q Pelon knew you worked as a bus driver?

A Yes.

[THE PROSECUTOR]: Objection; speculation.

[DEFENSE COUNSEL]: Did Pelon see you driving a bus?

THE COURT: Did you see Pelon while you were driving the bus?

THE WITNESS: Yes.

THE COURT: Was he a passenger?

THE WITNESS: Yes.

[DEFENSE COUNSEL]:

Q And you were driving the bus?

A Yes.

Q And he asked you for money in the past?

A Yes, he did.

Q So this wasn't the first time that you had this situation where Pelon came up to you and asked you for money?

A No, sir.

[RT 945–949; *see* Answer Ex. B at 14.]

**Recross–Examination.** The prosecutor elicited the following further testimony on recross-examination of petitioner as to the same subject:

[THE PROSECUTOR]: Up until this time, you and Eduardo Mejia had been friends? Up to January 19, 1996, you and Eduardo Mejia had been friends?

A Kind of.

Q Up until January 19, 1996, had you ever fought with him before?

[DEFENSE COUNSEL]: Objection. Beyond the scope of redirect.

THE COURT: He previously indicated he hadn't, but I'm not sure if something changed from cross-examination. [¶] Had you ever fought with him before?

THE WITNESS: Physically?

THE COURT: Yes.

THE WITNESS: No.

[THE PROSECUTOR]: Up to January 19, 1996, you said that you had given him money on prior occasions?

A Yes, I did.

Q Was there anything peculiar or anything out of the ordinary about him asking you for money on January 19, 1996?

A Yes.

Q What was that?

A Well, just the way he talked to me.

Q What was it that was out of the ordinary?

A Just asking for money—

THE COURT: Just asking for money what?

THE WITNESS: Because I was—because he knew I make a lot of money, because he would be asking for money.

THE COURT: He knew you made a lot of money, and he asked you for $10?

THE WITNESS: No. He asked me for more than that.

THE COURT: But on January 19th, he asked you for $10?

THE WITNESS: Yes.

[THE PROSECUTOR]: But he knew you had a job with RTD during the prior times that he asked you for money; right?

A Yes, sir.

Q What made his request for money on January 19, 1996, out of the ordinary?

A Well, I was going to give him the money.

THE COURT: The question was: What made it out of the ordinary? Anything?
THE WITNESS: No.

[RT 960–961; Answer Ex. B at 14–15.]

### 3. Decision of the California Court of Appeal

The California Court of Appeal rejected petitioner's claim, explaining:

> [Petitioner] contends the court erroneously limited his ability to explain his motive for giving money to Mejia as the evidence was relevant to establish his state of mind (as to why he called Shadow back) and to establish Mejia was acting in a menacing manner. [Petitioner] suggests that without a reasonable explanation of why he was willing to give $10 to Mejia when he was on the verge of completing a drug transaction he had gone to great lengths to effect, his testimony was less plausible.

> \* \* \*

> [Petitioner's] defense was not self-defense but rather that Shadow had shot Mejia; thus, [petitioner's] state of mind was not at issue. At best, an explanation of why [petitioner] was willing to give money to Mejia touched on a collateral issue—his credibility.

> As far as we can discern, the essence of [petitioner's] complaint is that the court refused to allow him to testify Mejia had strong-armed him for money in the past. However, the substance of the explanation was before the jury. Although [petitioner] did not expressly testify Mejia had previously strong-armed him for money, he did testify Mejia had asked him for money and he had given Mejia money in the past. [Petitioner] testified Mejia knew [petitioner] was working as a bus driver and had a steady source of funds. Furthermore, [petitioner] testified he was "a little bit" scared of Mejia, who had done things to scare [petitioner] in the past. The jury

could reasonably infer Mejia had some bad character trait which had caused [petitioner] to give Mejia money in the past and to be leery of Mejia on the night of the shooting.

[Answer Ex. B at 15–16.]

### 4. Analysis

■ The state appellate court reasonably determined that the substance of petitioner's explanation for his willingness to give money to Mejia at the time of the incident was fairly presented to the jury through petitioner's testimony. As set forth above, petitioner was allowed to testify that Mejia previously had threatened to shoot him by pointing a gun at him and that he was "a little bit" scared of Mejia. [RT 900–902, 946.] Further, the facts that Mejia knew petitioner had a job and had asked petitioner on several occasions to give him money were fairly presented during the prosecutor's cross-examination. Thus, the trial court did not unfairly limit petitioner's testimony on this issue.

Additionally, as the state appellate court correctly concluded, petitioner's state of mind regarding the money had no direct bearing on his defense that someone else had shot Mejia. Since petitioner has not shown that the unconstitutional exclusion of evidence was central to his defense, petitioner cannot overcome the further hurdle of demonstrating that exclusion of that evidence had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623, 113 S.Ct. 1710. Accordingly, petitioner is not entitled to relief on the basis of this claim.

### C. Ineffective Assistance of Counsel

Petitioner claims that he received ineffective assistance of counsel because his attorney: (1) failed to request a jury instruction modifying the standard instruc-

tion on reasonable doubt by "pinpointing" petitioner's defense of third-party culpability; (2) failed to present evidence in support of petitioner's defense of third-party culpability; (3) failed to present mitigating evidence at the sentencing hearing; and (4) failed to impeach Aguilar with prior criminal acts, her use of aliases, or her probationary status. [Amended Petition 21–26; Amended Supplemental Petition 6–20.]

To establish a prima facie claim of ineffective assistance of counsel, petitioner must demonstrate that his trial counsel's performance fell below an objective standard of reasonableness and that such deficient performance prejudiced the defense. *Williams,* 529 U.S. at 390, 120 S.Ct. 1495; *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Anderson v. Calderon,* 232 F.3d 1053, 1084 (9th Cir.2000), *cert. denied,* 534 U.S. 1036, 122 S.Ct. 580, 151 L.Ed.2d 451 (2001), *overruled on other grounds, Osband v. Woodford,* 290 F.3d 1036, 1043 (9th Cir. 2002). The reviewing court must reject a claim of ineffective assistance upon finding *either* that the defense counsel's performance was reasonable or that the alleged error was not prejudicial. *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052; *Anderson,* 232 F.3d at 1084.

Under *Strickland's* first prong, petitioner must show that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *Karis,* 283 F.3d at 1130. Scrutiny of counsel's performance must be "highly deferential," and petitioner must overcome "the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *see also Murtishaw,* 255 F.3d at 939 ("The defendant bears the heavy bur-

den of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy."). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *Lord v. Wood,* 184 F.3d 1083, 1086 (9th Cir.1999), *cert. denied,* 528 U.S. 1198, 120 S.Ct. 1262, 146 L.Ed.2d 118 (2000).

Under *Strickland's* second prong, petitioner must show a reasonable probability that, but for his trial counsel's errors, the result of the proceeding would have been different. *Williams,* 529 U.S. at 391, 120 S.Ct. 1495; *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *Anderson,* 232 F.3d at 1084. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The prejudice inquiry "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Williams,* 529 U.S. at 393 n. 17, 120 S.Ct. 1495; *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

**1. Failure to request an instruction**

■ Petitioner's claim that his attorney was ineffective for failing to request a modified reasonable doubt instruction informing the jury that petitioner had the burden of raising a reasonable doubt as to third-party culpability fails because even if petitioner's counsel had requested and received such an instruction, there is no reasonable likelihood of a different outcome. As discussed above, the California Court of Appeal concluded that no instructional error under California law had occurred when the trial court failed to give the jury

a similar instruction *sua sponte*. The state appellate court further concluded that, in view of the given instructions (including CALJIC 2.90, 2.91 and 2.92) which required the prosecution to "prove beyond a reasonable doubt [petitioner] was the one who committed the crime," "the jury could not have mistakenly believed [petitioner] had to do more than raise a reasonable doubt he was the one who did the shooting." [Answer Ex. B at 18.] Because the law—including the principle that the jury could not convict petitioner if it had a reasonable doubt about whether someone else might have committed the murder [7]— was made clear to the jury, and the jury found petitioner guilty, an additional cumulative instruction would not have resulted in a verdict more favorable to petitioner.

### 2. Failure to present evidence of third-party culpability

Petitioner complains that his attorney failed to present any testimony or evidence that a third party committed the murder.

■ To prevail on a claim that counsel was ineffective for failing to call a witness, petitioner must identify the witness, state with specificity what the witness would have testified to, and explain how that testimony might have altered the outcome of the trial. *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir.2001) (petitioner's speculation that a witness might have provided helpful information if interviewed is not enough to support ineffective assistance of counsel claim); *see United States v. Berry*, 814 F.2d 1406, 1409 (9th Cir.1987); *United States v. Schaflander*, 743 F.2d 714, 721 (9th Cir.1984), *cert. denied*, 470 U.S. 1058,

105 S.Ct. 1772, 84 L.Ed.2d 832 (1985). Petitioner also must show that the absent witnesses were actually available and willing to testify. *United States v. Harden*, 846 F.2d 1229, 1231–32 (9th Cir.1988), *cert. denied* 488 U.S. 910, 109 S.Ct. 264, 102 L.Ed.2d 252 (1988).

■ Contrary to petitioner's contention, such evidence was presented by way of petitioner's testimony. Petitioner testified that he did not kill Mejia, but that Shadow was the shooter, and that the only persons present at the time of the shooting were Mejia, petitioner, Shadow and Aguilar. [RT 792, 814, 817, 827, 903–904.] Aguilar testified at trial, and Mejia was dead. By petitioner's own admission, the whereabouts of the remaining purported eyewitness, Shadow, who had fled the shooting, was unknown, because petitioner had met him for the first time at a liquor store just before the shooting. [RT 886, 906.] Petitioner has failed to show that Shadow could have been located at the time of trial, and that he would have testified that he, and not petitioner, was the shooter. Counsel is not constitutionally ineffective for failing to call a potential witness when there is no evidence that individual would have testified at the petitioner's trial. *Harden*, 846 F.2d at 1231–1232.

In his original petition, petitioner did not identify any exculpatory witness or evidence that he believed counsel should have presented. In his amended petition, however, petitioner asserts that his attorney should have interviewed and called "Mr. Bracho," (aka "Rojo"), who would have "corroborated petitioner's credibility," and should have investigated evidence that oth-

---

7. As discussed, the jury was instructed that: If, after considering the circumstances of the identification and any other evidence in this case, you have a reasonable doubt whether defendant was the person who committed the crime, you must give the defendant the benefit of that doubt and find him not guilty. [CT 142].

er persons were arrested at the murder scene. [Amended Petition 25–26].

Petitioner's conclusory allegations are insufficient to warrant relief. Petitioner explains neither what information Rojo had information about the crime nor what Rojo would have or could have testified about. He also fails to present anything suggesting that Rojo would have been willing to testify on petitioner's behalf.

As support for his contentions that his attorney should have investigated others who were arrested at the scene of the shooting, petitioner cites a page of the trial transcript in which witness Richard Brito, who lived in the apartment complex where the shooting occurred, mentioned out of the presence of the jury that after the shooting, the police interviewed him and said that they would call him later to get a full statement. Brito explained that the police did not take a written statement from him "because the were having—you know, it was a lot of things going on. There was a couple gangbangers that I think also were arrested at the scene because they were loitering and they were dogging the police ...." [RT 427]. The "evidence" to which petitioner refers suggests that after the murder, while the police were interviewing witnesses and investigating the scene, gang members began to loiter around the scene and harass the officers. The "gangbangers" apparently were arrested for loitering. Petitioner does not allege, and nothing in the record indicates that the police arrested any other person whom they suspected of participating in the shooting.

Petitioner has not pointed to any exculpatory evidence that counsel neglected to uncover or use at trial. *Cf. Lord*, 184 F.3d at 1093–1096 (ineffective defense attorneys failed to interview, or use the testimony of, three witnesses who told defense investigators they saw the murder victim alive the day after her alleged murder); *Sand-*

*ers v. Ratelle*, 21 F.3d 1446, 1455–1461 (9th Cir.1994) (ineffective defense attorney failed to interview, or introduce testimony of, defendant's brother, whom the attorney knew was willing to admit he, not defendant, was the shooter). Accordingly, this aspect of his ineffective assistance of counsel claim fails.

### 3. Failure to present mitigating evidence during sentencing

■ In addition to finding petitioner guilty of first-degree murder, the jury found that he personally used a firearm within the meaning of section 12022.5(a) of the California Penal Code. [RT 1071]. Such a finding results in a sentence enhancement of three, four, or ten years. Cal.Penal Code § 12022.5(a). The trial court imposed the middle term of four years consecutive to the twenty-five year to life term for the murder. [RT 1093].

Petitioner contends that his attorney was ineffective for failing to present mitigating evidence at sentencing. In particular, petitioner complains that his attorney should have presented evidence that petitioner had been consistently employed, was a good employee, was a good husband and father, and had not been involved in gang activity since 1985. [Amended Supplemental Petition 37–39]. Petitioner has not demonstrated a reasonable likelihood that the trial court would have imposed the low term for the enhancement if counsel had presented any of this mitigating evidence.

To start with, at least some of the facts relied upon by petitioner already were before the trial court. Petitioner testified that he had been employed as a bus driver for over seven years. [RT 945]. Petitioner's counsel argued that the mitigating factors outweighed any aggravating factors, pointing to the following facts: (a) petitioner had no prior criminal history; (b) petitioner was employed by the RTD

for eight years full time; and (c) petitioner was residing with and supporting his wife and child. [RT 1089–1090].

In imposing the middle term, the trial court noted that petitioner actually did have a prior criminal record, which consisted of a 1991 conviction for brandishing a weapon, for which he received probation. The trial court further explained that petitioner had a weapon in this case and the victim was unarmed, so it was a "needless and senseless killing." [RT 1093]. Thus, the trial court concluded that the mitigating and aggravating factors were "equal," and imposed the middle term. [RT 1093].

The trial court imposed petitioner's sentence based upon an evaluation of the circumstances of the murder and upon petitioner's prior weapon use. There is no reasonable probability that additional testimony that petitioner was a good husband and father, was a homeowner, or no longer in a gang would have resulted in a shorter sentence. Therefore, his counsel's decision not to highlight this information was neither deficient performance nor prejudicial to petitioner.

### 4. Failure to impeach Aguilar

 Petitioner alleges that his attorney was ineffective for failing to impeach Aguilar with her prior crimes of moral turpitude, her prior use of aliases, and the fact that she was on probation when she testified against petitioner. [Amended Supplemental Petition 10–20].

The trial court denied petitioner's claim, stating that it had reviewed the exhibits presented by petitioner and "observed no felony convictions. There were juvenile petitions and misdemeanor convictions. The use of other names is not automatically admissible in trial." [Amended Supplemental Petition Ex. F].

Petitioner has not demonstrated that counsel's failure to impeach Aguilar with the evidence he cites was either deficient performance or that it prejudiced him.

Aguilar's misdemeanor convictions for unlawful driving or taking of a vehicle and theft [See Amended Supplemental Petition, Exs. M–P] were not admissible in petitioner's trial to impeach her credibility. *People v. Wheeler*, 4 Cal.4th 284, 300, 14 Cal. Rptr.2d 418, 841 P.2d 938 (1993). California law, however, permits the introduction of underlying conduct that resulted in the misdemeanor conviction if that conduct "has some logical bearing upon the veracity of a witness in a criminal proceeding," which requires that the conduct involve moral turpitude. *Wheeler*, 4 Cal.4th at 295, 14 Cal.Rptr.2d 418, 841 P.2d 938.

Assuming that Aguilar's misdemeanor conduct would have been admissible to impeach her, there is no reasonable likelihood that the admission of that evidence would have resulted in a more favorable verdict. Aguilar was convicted as a juvenile of misdemeanor shoplifting and vehicle theft/taking a vehicle without consent. [Amended Supplemental Petition Ex. M (Aguilar's rap sheet).] It is unlikely that the jury would have disregarded Aguilar's testimony based on these misdemeanor convictions.

With regard to evidence of Aguilar's use of aliases, the trial court explained that such evidence would not "automatically" be admissible. [Amended Supplemental Petition Ex. F]. California law provides that the use of an alias may be admissible as impeachment if it reflects on the witnesses's credibility. For example, the use of an alias under penalty of perjury would be admissible. *People v. Cooper*, 53 Cal.3d 771, 822, 281 Cal.Rptr. 90, 809 P.2d 865, *cert. denied*, 502 U.S. 1016, 112 S.Ct. 664, 116 L.Ed.2d 755 (1991). Petitioner provides evidence that Aguilar used three alternative names. [Amended Supplemental Petition Ex. M (Aguilar's rap sheet).] Even assuming her use of aliases would have been admissible, considering all of

the circumstances, such evidence would not have significantly undermined her credibility in order to find prejudice under *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

Finally, with respect to evidence that Aguilar was on probation when she testified, petitioner has not shown that such evidence would have been admissible to impeach her. The records provided by petitioner show that on November 7, 1997, Aguilar received two years of summary probation for her misdemeanor theft conviction. [Amended Supplemental Petition Ex. O]. She was also ordered to pay $135 in fines. On March 9, 1998, the court noted that Aguilar had not paid her fine. Aguilar's probation was revoked on April 2, 1998, and she was ordered to pay a $250 fine. On May 7, 1998, the court issued a "bench warrant in the amount of $250." [Amended Supplemental Petition Ex. O].

■ California law provides that a "witness's probationary status may be used to show his potential bias or prejudice based on concern of jeopardy to his probation." *People v. Espinoza,* 73 Cal. App.3d 287, 291, 140 Cal.Rptr. 846 (1977).

Aguilar's initial taped interview with police, in which she detailed the crime and named petitioner as the shooter, occurred on January 20, 1996 (the day after the murder). Thus, Aguilar identified petitioner almost two years before she was sentenced to probation. Her probationary status could not have affected the veracity of statements she made to the police. Petitioner's assertion that Aguilar's probationary status gave her a reason to fabricate her testimony at trial because the prosecution made a "deal" with her in which her revocation would be dropped if she testified in petitioner's case is purely speculative and lacks any factual support. [Amended Supplemental Petition 18].

On October 16, 2007, petitioner supplemented the record with additional documents, including Aguilar's juvenile criminal records which reflect that in 1992, she was found guilty of a felony as a juvenile, namely, assault with a deadly weapon. Aguilar's juvenile adjudication would have been admissible to impeach her. *See* Art. I, § 28, subd. (f) of the Cal. Const. (stating that "any prior felony conviction, whether adult or juvenile, shall ... be used without limitation for purposes of impeachment or enhancement of sentence in any criminal proceeding."); *In re Manzy W.,* 14 Cal.4th 1199, 1209, 60 Cal.Rptr.2d 889, 930 P.2d 1255 (1997).

Nevertheless, even assuming that all of the impeachment evidence had been presented against her—including the juvenile assault adjudication, her probationary status, the prior misdemeanor conduct (which provided the basis for her probation) and her aliases—this evidence would not have so affected Aguilar's credibility that a jury would be likely to disbelieve her testimony. While all of this evidence suggests that Aguilar was not a model citizen, it did not give her an apparent motive to lie about petitioner's involvement in the murder of Mejia.

This is especially true because Aguilar's testimony was corroborated by an independent witness, Ayala, who was watching the events from her apartment window. While Ayala could not identify petitioner, Mejia, or Aguilar, she observed an argument between two men (not three as petitioner's testimony suggested) in the presence of a woman, and she observed one of the men then shoot the other in the stomach. [RT 571, 574–587.]

In addition, Mejia was killed with a ".38 special" bullet, and such a bullet was found in petitioner's bedroom closet. [RT 519–520, 664, 725].

Further corroboration exists in petitioner's flight after the shooting, which "demonstrate[s] consciousness of guilt." *People v. Hill,* 67 Cal.2d 105, 120, 60 Cal.Rptr.

234, 429 P.2d 586 (1967). It was undisputed that petitioner fled the murder scene by ramming the parking lot gate with his car, and that a few days later, he left the country. [RT 406–407, 413–415, 474–475, 819–820]. Petitioner spent two years in Brazil, then returned to the United States using a false name. [RT 820].

For these reasons, there is no reasonable likelihood that additional impeachment of Aguilar would have resulted in a more favorable verdict.

### 5. Failure to make use of absence of forensic evidence

■ In his original petition, petitioner also complained that his counsel failed to make use of the fact that there was no forensic evidence pointing to petitioner as the killer. [Petition, Points & Authorities at 13.] It does not appear that petitioner included this allegation in his amended petition or his amended supplemental memorandum. In the interest of a complete record, however the Court addresses it.

According to his own testimony, petitioner had carried away the semi-automatic weapon that Mejia had unsuccessfully tried to draw when he was shot by Shadow with a revolver, and that Aguilar had seen in petitioner's hand; and petitioner had disposed of the weapon by throwing it out of his car while driving on the freeway. [RT 816, 891, 902, 904–905, 907.] That weapon, if recovered and examined for a possible "match" with the bullet found in Mejia, could have exculpated or implicated petitioner.

Petitioner's counsel called Anthony Paul, a forensic firearms examiner for the Los Angeles Police Department, who identified a bullet fragment extracted from the victim as a "caliber .38 special" bullet and opined that it was fired from a revolver. [RT 513, 520, 523, 533, 658, 664–666.] This witness's testimony, while consistent with petitioner's story as to the type of weapon used to kill Mejia, would have been of more value to the defense if petitioner had preserved the semi-automatic weapon he said he had taken from Mejia after the shooting. During cross-examination, petitioner's counsel showed Aguilar exemplars of a revolver and a semi-automatic weapon and got her to state that the gun she had seen petitioner holding looked more like the semi-automatic weapon than the revolver, consistent with petitioner's account that he was seen holding a weapon other than the murder weapon. [RT 384–388.] In sum, in the absence of any recovered weapon, petitioner's counsel was unable to elicit testimony from either a police expert or an eyewitness that buttressed petitioner's account of the shooting in a material respect.

Petitioner has not shown that his counsel could have done anything more. Because he has failed to establish that his trial counsel's performance was deficient, his claim fails. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *Murtishaw,* 255 F.3d at 939.

### D. Prosecutor's presentation of false testimony

Petitioner alleges that the prosecutor committed misconduct by knowingly using the perjured testimony of Aguilar.

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103 & nn. 7–9, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (citations omitted); *Giglio v. United States,* 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Benn v. Lambert,* 283 F.3d 1040, 1058 n. 11 (9th Cir.2002), *cert. denied,* 537 U.S. 942, 123 S.Ct. 341, 154 L.Ed.2d 249 (2002); *Phillips v. Woodford,* 267 F.3d 966, 985 (9th Cir.

2001); *United States v. Young*, 17 F.3d 1201, 1203 (9th Cir.1994). "[T]he knowing use of false testimony to obtain a conviction violates due process regardless of whether the prosecutor solicited the false testimony or merely allowed it to go uncorrected when it appeared." *United States v. Bagley*, 473 U.S. 667, 679 n. 8, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

■■■■ Mere inconsistencies in the evidence do not constitute the knowing use of perjured testimony by the prosecution. *United States v. Zuno–Arce*, 44 F.3d 1420, 1423 (9th Cir.1995), *cert. denied*, 516 U.S. 945, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995). The fact that witnesses have given inconsistent or conflicting testimony does not establish that such testimony was false. *United States v. Croft*, 124 F.3d 1109, 1119 (9th Cir.1997); *United States v. Sherlock*, 962 F.2d 1349, 1364 (9th Cir.1989) ("The record does not show and we do not presume that the prosecutor used false testimony"), *cert. denied*, 506 U.S. 958, 113 S.Ct. 419, 121 L.Ed.2d 342 (1992). Rather, "[d]iscrepancies in testimony ... could as easily flow from errors in recollection as from lies." *Zuno–Arce*, 44 F.3d at 1423. Petitioner must point to something in the prosecutor's questioning, or the answers given, that may be construed as reflecting an intention by the prosecutor to mislead the jury. *United States v. Etsitty*, 130 F.3d 420, 424 (9th Cir.1997), *cert. denied*, 525 U.S. 1003, 119 S.Ct. 515, 142 L.Ed.2d 427 (1998).

■■■■ Even if a prosecutor unwittingly presents false evidence, the defendant is entitled to a new trial only if "there is a reasonable probability that [without the evidence], the result of the proceeding would have been different." *Young*, 17 F.3d at 1204 (citation omitted); *Spivey v. Rocha*, 194 F.3d 971, 979 (9th Cir.1999), *cert. denied*, 531 U.S. 995, 121 S.Ct. 488, 148 L.Ed.2d 461 (2000).

■■■ Petitioner maintains that in her January 20, 1996 statement to Detective Garcia, Aguilar stated that she had not exited her car until after shots were fired and had not heard the content of an alleged argument between petitioner and Mejia; whereas at trial, Aguilar testified that she was an eyewitness to the shooting, had seen petitioner shoot Mejia with a semi-automatic pistol, and had heard a dispute between petitioner and Mejia about a gun petitioner had allegedly loaned to Mejia. [Amended Petition 27–28.]

A comparison of the transcript of Aguilar's tape-recorded statement to Garcia [CT 65–99] and Aguilar's trial testimony [RT 302–393] reveals that any inconsistencies do not support the conclusion that Aguilar gave false testimony. For the same reason, the discrepancies do not support a conclusion that the prosecution knowingly used or allowed false testimony at trial. *See Croft*, 124 F.3d at 1119; *Zuno–Arce*, 44 F.3d at 1423; *Sherlock*, 962 F.2d at 1364.

In her police statement, Aguilar said that she saw petitioner shoot Mejia at close range in the stomach ("he just came up to him and shot him right here in his stomach") with a "big," "black gun" that "you pull ... to the side"; she "saw [petitioner] just pulled it and ... shot him." [CT 73, 92–93.] At trial, on direct examination, Aguilar said that she saw petitioner point a "black" gun "right next to him" from "[a] few inches" away and shoot Mejia in the mid section of the abdomen. [RT 328–330.] On cross-examination, she said she did not know the difference between a revolver and a semi-automatic weapon, but the weapon she saw petitioner shoot was "black, long." [RT 352, 354.] After being shown exemplars of a revolver and a semi-automatic weapon by petitioner's counsel, Aguilar testified that the weapon she saw petitioner holding looked

"something like" the semi-automatic weapon, but she admitted that she had not been able to get a good view of the weapon at the time of the incident. [RT 384–388.] The police statement and trial versions of Aguilar's account of the incident, then, did not differ in any material respect as to these matters.

In her police statement, Aguilar stated that when Mejia left her car, "I don't know what they were saying, 'cause I couldn't hear anything." [CT 72–73.] When she saw the gun and that Mejia was putting his hands to his face and looking scared, she heard petitioner saying, " 'Don't fuck with me. Don't fuck with me.' And that's the one who shot him." [CT 72.] "[T]hat's when I got out of the car." [CT 72, 92.] She did not know why the two men had been arguing or why petitioner had shot Mejia. [CT 73, 79.] She had not heard either man say anything about giving back money owed. [RT 79.] Pressed for a reason for the shooting, she stated that petitioner had loaned a gun to Mejia that had not been returned to petitioner but that Mejia had told her he did not have the gun anymore. [RT 79, 84–85.] She said she was "pretty sure it's because of a gun" despite the fact that "I don't know why they were arguing about it [the gun]" and "I didn't hear nothing. All I heard was Rudy [petitioner] telling him, 'Don't fuck with me. Don't fuck with me.' " [RT 84.] However, on direct examination at trial, Aguilar testified that, at the time of the incident, she had heard: petitioner say that he wanted his gun; Mejia say, "Don't kill me because my girlfriend's pregnant"; petitioner say, "Don't fuck with me"; Mejia say, "I have your gun. I have it at home and I'm going to give it back to you"; and petitioner say, "I don't want the gun. It's too late." [RT 328–329.] Petitioner's counsel confronted Aguilar with the text of her prior inconsistent statements to Garcia and another detective about not being able to hear the two men arguing and not

knowing why the argument or shooting occurred, whereupon she denied ever making such statements to the police. [RT 347–349, 366–374.] Petitioner's counsel then impeached Aguilar by having Garcia testify that he had tape-recorded Aguilar's statement without her knowledge, and having the detective confirm that Aguilar had made to him the statements that she was disputing at trial. [RT 763–774.]

The inconsistencies in Aguilar's trial testimony are not sufficient to show that Aguilar committed perjury, much less that the prosecution knew that she was lying. Petitioner offers no evidence outside the trial court record to support his allegation that the prosecution knowingly used false testimony or otherwise intended to mislead the jury, or that Aguilar's trial testimony was actually false. Furthermore, petitioner's counsel had the opportunity to confront Aguilar, and to impeach her, with her prior inconsistent statements to police. *See Agurs*, 427 U.S. at 103 & nn. 7–9, 96 S.Ct. 2392; *Benn*, 283 F.3d at 1058 n. 11; *Phillips*, 267 F.3d at 985; *Young*, 17 F.3d at 1203–1204.

### E. Prosecutor's failure to disclose Aguilar's criminal history and probationary status

Petitioner alleges that the prosecutor committed misconduct by failing to disclose Aguilar's criminal history and probationary status. [Amended Supplemental Petition 22–32.]

In denying this claim, the trial court explained, that "since the criminal histories were in the Public Defender's file and all were dated in 19[98], prior to the trial date, there is no showing of willful failure to provide the requested discovery by the district attorney." [Amended Supplemental Petition Ex. F].

"[The] suppression by the prosecution of evidence favorable to an accused upon re-

quest violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Benn,* 283 F.3d at 1052; *Murtishaw,* 255 F.3d at 959; *see also Agurs,* 427 U.S. at 110, 96 S.Ct. 2392 ("If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor."). This general discovery obligation, known as the *Brady* rule, requires the prosecution to disclose to the defense exculpatory evidence, including impeachment evidence, regardless of whether it is requested by the defendant. *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *United States v. Bagley,* 473 U.S. 667, 674, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Paradis v. Arave,* 240 F.3d 1169, 1176 (9th Cir. 2001).

To show a *Brady* violation, petitioner must prove that the exculpatory or impeaching evidence is favorable to him, the evidence was willfully or inadvertently suppressed by the prosecution, and prejudice ensued. *Strickler,* 527 U.S. at 281–282, 119 S.Ct. 1936; *Benn,* 283 F.3d at 1052.

As discussed, the state court concluded that Aguilar's rap sheet was contained in the public defender's file and that the defense possessed her rap sheet before trial.[8] Petitioner has not rebutted this finding with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Because defense counsel had evidence of Aguilar's criminal history and probationary status before trial, petitioner cannot demonstrate that the prosecution suppressed that evidence. Moreover, as discussed above, the evidence of Aguilar's criminal history, even if admissible, would not have changed the outcome of petitioner's trial, so he was not prejudiced by its alleged "suppression."

**F. The state courts' handling of petitioner's habeas petitions**

 Petitioner's claim that the state courts improperly handled his habeas petitions are not cognizable, because federal habeas relief "is not available to redress alleged procedural errors in state post-conviction proceedings." *Ortiz v. Stewart,* 149 F.3d 923, 939 (9th Cir.1998).

## V. Conclusion

It is recommended that the petition be denied.

---

8. Petitioner concedes that he obtained the rap sheets from his attorney's file. [Amended Supplemental Petition 7].